[L. A. No. 1206.   Department One.—August 1, 1904.]

## PATRICK COLLINS and JOHN COLLINS, Respondents, v. BELLA K. MAUDE, Appellant.

ESTATES OF DECEASED PERSONS—FOREIGN ADMINISTRATION—RESIDENCE OF DECEDENT—JURISDICTION—IMPLIED FINDING—CONFLICTING EVIDENCE.—Where the superior court, in an action upon a note and mortgage by the distributees of the estate of a deceased person under a decree of distribution thereof had in a city court of another state found that such court had jurisdiction of such estate and of its settlement, and authority to issue letters of administration thereon, such finding necessarily implies that the decedent was a resident of such city and state, if essential to the jurisdiction; and where the evidence was conflicting as to the *bona fide* character of such residence the finding will not be disturbed upon appeal.

ID.—BURDEN OF PROOF—PRESUMPTIONS IN SUPPORT OF JUDGMENT.—The burden of showing a want of jurisdiction in such foreign court is upon the defendant sued upon such note and mortgage, and in view of the presumptions indulged in support of the judgments of courts of record, the burden of proof requires clear and convincing evidence of such want of jurisdiction.

ID.—DISTRIBUTION OF PERSONAL ESTATE—NOTE AND MORTGAGE—LAW OF DOMICILE.—Where it appears that the decedent resided in the city and state where she died, and where administration was had of her estate, the distribution of her personal estate was governed by the law of such state; and a note and a mortgage upon property in this state, securing such note, which were delivered to the administrator of such estate, and distributed by the city court in such other state, were properly distributed within the jurisdiction of that court, and it is immaterial that the note and mortgage were not in such state when the administration was begun.

ID.—FORECLOSURE OF NOTE AND MORTGAGE BY DISTRIBUTEES—DEFENSE—GIFT OF DEBT BY DECEDENT—ABSENCE OF DELIVERY.—A writing by the decedent before leaving this state, declaring her wish that the maker of the note should not be asked for the money borrowed or the interest on it, the note and mortgage being retained, and not surrendered, does not show a gift of the debt or an intention to forgive it, and is not a defense to the foreclosure of the note and mortgage by the distributees thereof. There can be no gift without an intention to give and a delivery, either actual or constructive, of the thing given.

ID.—POSSESSION OF NOTE—PAYMENTS NOT INDORSED—PRESUMPTION—SUPPORT OF FINDING.—The possession of the note by the distributees, without any indorsements of payments thereon, raised the presumption that no payments had been made upon it; and it cannot

CXLIV. Cal.—19

be said that the court erred in finding in favor of such presumption, as against the uncorroborated testimony of the defendant.

APPEAL from an order of the Superior Court of Riverside County denying a new trial. J. S. Noyes, Judge.

The facts are stated in the opinion.

Collier & Carnahan, for Appellant.

There was a good constructive delivery of the debt, the chief question being the intent of the donee. (*Penford* v. *Mould,* L. R. 4 Eq. 562; *Poullain* v. *Poullain,* 79 Ga. 487; *Tenbrook* v. *Brown,* 17 Ind. 410; *Wurz* v. *Merchant,* 57 Me. 383; *Miller* v. *Neff,* 33 W. Va. 197; *Ellis* v. *Secor,* 31 Mich. 184; *Garrigan* v. *Anden,* 10 Johns. 292.) The deceased was a resident of California. The foreign judgment may be attacked for want of jurisdiction by evidence *dehors* the record. (*Estate of James,* 99 Cal. 377; *Greenzweig* v. *Strelinger,* 103 Cal. 278; *Eureka etc. Co.* v. *California Ins. Co.,* 130 Cal. 154; *Thompson* v. *Whitman,* 18 Wall. 457; *Pennoyer* v. *Neff,* 95 U. S. 714.)

C. L. McFarland, for Respondents.

No delivery of the note, actual or symbolical, was effected, as required by law. (Civ. Code, secs. 1146, 1147; 14 Am. & Eng. Ency. of Law, 2d ed., p. 1015; 2 Kent's Com., 12th ed., pp. 438, 439; *Gammon Theological Seminary* v. *Robins,* 128 Ind. 85; *Hillebrant* v. *Brewer,* 6 Tex. 45;[1] *Payne* v. *Powell,* 5 Bush, 248; *Green* v. *Langdon,* 28 Mich. 222; *Smith* v. *Dorsey,* 38 Ind. 451;[2] *Smith* v. *Ferguson,* 90 Ind. 229;[3] *Devol* v. *Dye,* 123 Ind. 321; *Zeller* v. *Jordan,* 105 Cal. 148; *Giselman* v. *Starr,* 106 Cal. 651; *Ruiz* v. *Dow,* 113 Cal. 490; *Knight* v. *Tripp,* 121 Cal. 674.) The court at St. Louis had jurisdiction of the estate and of the note and mortgage, and the distribution thereof was governed by the law of Missouri. (*Estate of Apple,* 66 Cal. 432; 2 Kent's Com. 429.) The finding of jurisdiction of that court must be sustained, the evidence being conflicting. (*Estate of Olmstead,* 122 Cal. 224; *Moore* v. *Copp,* 119 Cal. 429; *Broder* v. *Conklin,* 121 Cal. 282; *Loftus* v. *Fischer,* 113 Cal. 286.)

---

[1] 55 Am. Dec. 757.        [3] 46 Am. Rep. 216.
[2] 10 Am. Rep. 118.

CHIPMAN, C.—Plaintiffs bring the action to foreclose a mortgage on property in Riverside County, given by defendant to secure her promissory note for two thousand dollars, May 27, 1892, due five years after date, with ten per cent annual interest. The note and mortgage were given to Julia Mann, but the money was furnished by Bridget Collins, to whom Julia executed an assignment. Bridget came from Ireland about 1865 and took service as a cook with defendant at St. Louis, Missouri, and worked for her sixteen or seventeen years, and it was there she accumulated this money. Her two brothers, plaintiffs in the action, have for many years resided in St. Louis. As near as we can determine from the evidence, Bridget came to California in 1891. She worked for others several months, and came to defendant and remained about a year. Later Bridget worked for another family, and in the latter part of 1893 her health failed her and she was taken to defendant's home and cared for. Defendant testified: "She was a good deal over sixty," and could neither read nor write. In December, 1893, Bridget determined to return to St. Louis for the advice of a doctor who had been successful formerly in treating her. Defendant and Bridget had some conversation concerning the note and mortgage, and on the day Bridget left for St. Louis she executed the following document:—

"I am leaving for St. Louis, and before I start I write this is to certify that it is my wish that Mrs. Maude [defendant] shall not be asked for the money she borrowed from me or the interest on it. She and I have a perfect understanding about my business. I affix my name in the presence of these witnesses, this twenty-first day of December, eighteen hundred and ninety-three.

"BRIDGET (X her mark) COLLINS.

"H. Meyer, Helen Ward."

On her arrival at Kansas City, Missouri, Bridget became ill, and on December 27, 1893, was attended by a physician, who testified that he diagnosed her case as chronic progressive dementia, and that she died at Kansas City December 29, 1893. On January 24, 1894, plaintiff Patrick Collins petitioned the probate court of St. Louis, Mo., for letters of administration on Bridget's estate, setting forth that he and plaintiff John Collins were brothers of the deceased and her only heirs at

law, and that she died intestate, leaving an estate consisting of a note and mortgage for two thousand dollars and cash in bank two hundred dollars. On the same day the court issued letters reciting: "Whereas Bridget Collins, late of the city of St. Louis, died intestate, as it is said, having at the time of her death property in this state, which may be lost, destroyed or diminished in value if speedy care be not taken of the same, to the end, therefore, that the said property may be collected, preserved and disposed of according to law, we do hereby appoint Patrick Collins administrator of all and singular the goods and chattels, rights and credits which were of the said Bridget Collins at the time of her death with full power and authority to secure and dispose of said property, according to law, and collect all moneys due said deceased," etc. On March 5, 1894, the court made an order approving the appointment of Patrick Collins as administrator, "taken and granted by the judge and clerk of this court in vacation since the last term thereof." Inventory was duly returned and filed May 26, 1894, and described the note and mortgage in question; also cash on deposit in Riverside Savings and Loan Association, Riverside, Cal., $198.90; on her person, $45; and wearing apparel valued at $27.05; also, an account against Miss Mangan, $200,—making in all $2,470.95. Notice was given of final settlement of the estate to be held at the ensuing September term of the court, at which final settlement and distribution were decreed October 28, 1896. Among other things the court ordered the administrator to assign and transfer to himself and his brother John, as sole heirs of the deceased, each an undivided one half of the note and mortgage in question and other property, and on March 28, 1897, the administrator was discharged. Defendant claimed in defense: 1. That she had paid the note in part; 2. That on December 21, 1893, Bridget "gave to defendant the sum evidenced by the note and mortgage, and forgave the indebtedness;" and 3. That the St. Louis court had no jurisdiction of the probate proceedings in said estate.

The court found against defendant on these issues and gave judgment for plaintiffs for the full amount of principal and interest of the note and rendered a decree of foreclosure. Defendant appeals from the order denying her motion for a new trial.

1. The question of jurisdiction demands first attention. The jurisdiction of the Missouri court is challenged upon the grounds that at the time of her death Bridget Collins was not a resident of St. Louis. The superior court, however, has found upon the evidence before it that the court of the city of St. Louis, state of Missouri, had jurisdiction of her estate and of its settlement, and authority to issue letters of administration therein. This finding necessarily implies that she was a resident of St. Louis, if that fact was essential to give such jurisdiction to that court. (*Moore* v. *Copp*, 119 Cal. 429; *Broder* v. *Conklin*, 121 Cal. 282.) And as there was a conflict of evidence as to whether she was a *bona fide* resident of the city of St. Louis when she died, this finding cannot be disturbed. (*In re James*, 99 Cal. 374.[1])

There is no direct evidence showing that Bridget ever intended becoming a permanent resident of California. She had resided many years in St. Louis, where her only relatives in this country resided, before coming to this state. She was unmarried and had reached an advanced age and there was testimony that she was not physically capable of performing the duties of servant as theretofore. Defendant testified that Bridget said she thought she would "be back." Mr. Abbott, cashier of the bank, when given the custody of the note and mortgage, testified that she came to the bank on December 21st, the day she signed the paper held by defendant, and drew out some money. He testified: "My impression is then was the time she told me she was going east and might not return and wanted to leave the papers for safe-keeping." She was so seriously ill when she departed that she died before reaching St. Louis. The St. Louis court in its appointment of the administrator mentions her as "late of the city of St. Louis," and so also did the petition for letters filed by plaintiff Patrick Collins.

The burden of showing want of jurisdiction in the St. Louis court was on the defendant, and in view of the presumptions which are indulged in support of judgments of courts of record, this burden requires clear and convincing proof of such want of jurisdiction. The fact that Bridget came to California about the year 1891 and remained nearly three years does not compel the inference that she had thus abandoned her resi-

---

[1] 37 Am. St. Rep. 60.

dence at St. Louis.  Upon the question of Bridget's residence at the time of her death, there is sufficient evidence to create a substantial conflict.  As the court found that Bridget resided in St. Louis at her death, the distribution of her personal estate was governed by the law of that state.  (*Estate of Apple,* 66 Cal. 432.)  The property was in fact delivered to the administrator at St. Louis and thenceforward was within the jurisdiction of the St. Louis court.  No administration was had in this state; no claim was made on the property by any one in this state; and hence no question arises as to any conflict of jurisdiction.  The fact that the note and mortgage were in this state when letters issued in St. Louis is immaterial.

2. The writing signed by Bridget does not on its face import a gift to defendant of the sum evidenced by the note and mortgage, or an intention to forgive the debt.  "A gift is a transfer of personal property, made voluntarily and without consideration."  (Civ. Code, sec. 1146.)  To constitute a transfer the writing should contain words apt to effect a transfer or show an intention to transfer.  In the paper before us Bridget did no more than to say that as she was about to go to St. Louis she did not wish in her absence that Mrs. Maude should be asked for the money she had borrowed or the interest.  Before it could be held that this language effected a transfer something more must be shown than the paper writing itself.  Defendant undertook to do this by evidence which was admitted without objection by plaintiffs.

Mrs. Ward, a witness to the signature of Bridget, and sister of defendant, testified that defendant wrote the body of the paper; and when asked to state what directions Bridget gave defendant before writing it, replied: "She told her to write, she was not to be asked for the principal or interest."  There was evidence that Bridget had said on several occasions that she intended that defendant should have her money and that she did not intend to do anything more for her brothers.  Defendant, as did other witnesses, testified that Bridget was very strongly attached to her.  Speaking of the loan, witness explained that Bridget wanted her to take her money which was then in a St. Louis bank.  It was sent for and loaned to defendant on the date of the note and mortgage.  Witness testified that Bridget often spoke of this money as belonging to witness, as she had paid it to Bridget originally.. The

witness was asked particularly as to what occurred when the
paper was signed by Bridget. After relating the circumstan-
ces which brought the matter up, witness testified: "I said,
I am not worried about that, but what troubles me is I don't
want to be worried and bothered about that interest if it
should fall due before you come back. She said, "you must
not be bothered.' I said, 'it is in the bank to be collected'
and she said 'go down to the bank and get it out.' This con-
versation took place that afternoon after we had gone home.
It was raining very hard; it was time the bank was closed;
I supposed it was closed by that time. Well she said 'I will
give you a paper about it.' She said 'you sit right down to
the desk and you write this yourself, you are not to be bothered
about it. She said I got it from you and it is yours.' She
told me to write that. I sat down; she said 'you are not to be
bothered about any of it. Not to ask you for the interest or
anything else.' So I sat down and wrote a paper I thought
covered it. I am not very good at business writing I must
say. It never entered my head that she would die, but I
just wrote what I thought she meant. I wrote it under her
instructions and then took her to the depot." Witness Abbott,
cashier of the Riverside Savings and Loan Association, testi-
fied that Bridget opened an account in his bank June 6, 1893,
and made several deposits; that she came to the bank on De-
cember 21, 1893 (the day she left for St. Louis,) and
got some money, and his impression was that she left
the assignment of the note and mortgage with him at
that time; and she told him she was going away, and
he advised her to have the assignment recorded; that
she had not recorded it because some one had a claim
against her for twenty dollars, which she said she did not
owe, and that Mrs. Maude had advised her not to record
the assignment. Witness afterwards, on December 29, 1893,
had it recorded, and later, upon an order of the probate court
of St. Louis, turned over the note and mortgage and assign-
ment and Bridget's balance on account. We cannot see that
this evidence leads necessarily to the conclusion claimed for.
it by defendant. Defendant wrote the paper signed by
Bridget, and we think the court was warranted in holding
that its purpose was not enlarged beyond its terms by any
attendant or preceding circumstances. It must be presumed

that defendant used as strong and expressive language as she was authorized to use, for she drew the paper herself in her own interest. Indeed, she testified that she wrote a paper which she thought covered Bridget's wish. Something more definite could have been said than was said if there was a mutual understanding that Bridget was surrendering control and ownership of these evidences of indebtedness. Mr. Abbott, speaking of the day Bridget left for St. Louis, testified that she came to the bank. He testified: "I am sure it was at that time that I had a talk with her about recording the assignment; I saw it at that time. It is possible that I had those papers there for safe-keeping for some time, but I don't think it probable. My impression is that it was the day she came in. Mrs. Maude was not with her at the time she came in to get the money; in fact, if my memory serves me right, she told me Mrs. Maude had n't any knowledge that she was bringing it in; she did n't want her to bring it in." If Bridget had wished to give these evidences of indebtedness to Mrs. Maude on that day, or to forgive her the debt, she would most likely have taken those papers to her and not left them in the bank. Whatever disposition Bridget intended ultimately to make of her claim upon Mrs. Maude, we cannot say that the evidence without conflict shows that she intended or that Mrs. Maude then thought she intended to sign a paper the effect of which was to transfer the note and mortgage or to operate as a forgiveness of the debt evidenced by them.

Referring to sections 1146 and 1147 of the Civil Code, relating to gifts, it was said in *Knight* v. *Tripp,* 121 Cal. 674: "There can be no gift without an intention to give, and a delivery, either actual or constructive, of the thing given. There must be both a purpose to give and the execution of this purpose. The purpose must be expressed—either orally or in writing—and it must be executed by the actual delivery to the donee of the thing given, or of the means of getting possession and enjoyment thereof. It is the fact of delivery that converts the unexecuted and revocable purpose into an executed and complete gift." In *Pullen* v. *Placer County Bank,* 138 Cal. 169,[1] it was said: "A gift vests the donee with the absolute property in the thing given, and it is no longer subject to the control of the donor. If, on the other hand,

---

[1] 94 Am. St. Rep. 19.

the thing given remains under the control of the donor, or (except in the case of a gift *causa mortis*) is subject to his revocation, his gift is not complete. There is no difference, however, in this particular between a gift *inter vivos* and a gift *causa mortis*. In either case it is not complete unless there is either an actual or symbolic delivery to the donee of the thing to be given." In the case last cited a father intended to give his son money that was in bank and gave the son a check for the amount. The father died before the check was presented, and it was held that the check was not a symbolic delivery, but was revocable by the father, and that his death worked a revocation. Said the court: "By the failure of the son to present the check there was no delivery of the money during the lifetime of the father, and the gift was therefore not complete."

If we could look to the paper signed by Bridget as evidence of an intended transfer, Mrs. Maude failed to demand possession of the note and mortgage until after Bridget died. Indeed, she never has demanded or obtained their possession, so far as appears. She relies apparently on the paper as having effected a present transfer, which, we think, cannot be maintained. Bridget's declarations on previous occasions to Mrs. Maude—"The money is yours"; and again, "Take the money and go" (to Europe) "it is yours;" her statement to witness Ward "that she had made up her mind that Mrs. Maude and Leesy," as she called him, "should have her money," at best were expressions of Bridget's then mental attitude towards Mrs. Maude, but no step was taken to carry out her apparent willingness to give Mrs. Maude her money. Prior to her death Bridget never for a moment surrendered control of her property, and but a few hours before she left for St. Louis she gave instructions concerning her property to the bank having custody of it. Upon no principle of law can we see how the trial court could have reached a conclusion favorable to defendant's contention.

3. The court found that the note was wholly unpaid. It is claimed that the evidence shows without conflict that one year's interest was fully paid and that defendant paid sixty dollars at one time as interest. Defendant testified that she made two payments on account of interest but did not know whether she paid more than one year's interest; that she paid sixty dollars the last time about two months before Bridget

gave her the paper. It was her "impression" that it "paid the interest up to about that time." She had no receipts, and the payments were not indorsed on the note. She did not remember when she made the first payment on the interest or the amount. There was no corroborative evidence of these alleged payments. The possession of the note without indorsement raised the presumption that no payment had been made on it. We cannot say that the court erred in holding the unsupported testimony of defendant coming from an interested witness to be too weak and unreliable to overcome this presumption. (*Sarraille* v. *Calmon,* 142 Cal. 651.)

It is advised that the order be affirmed.

Cooper, C., and Harrison, C., concurred.

For the reasons given in the foregoing opinion the order appealed from is affirmed.

Shaw, J., Angellotti, J., Van Dyke, J.