JOHN W. HALL

*v.*

DAISY GABBERT.

*Opinion filed December 22, 1904.*

1. ILLEGITIMATES—*courts will not presume that marriage was to avoid result of prosecution.* Courts will not presume that one arrested for bastardy who marries the prosecutrix did so to avoid the consequences of the prosecution, but will rather assume that if there was any doubt of his paternity of the child he would have resisted the prosecution and refused marriage.

2. SAME—*domicile of father at time of birth of child does not control right to inherit in other States.* The law of the domicile of the father at the time of the birth of an illegitimate child does not control the question of the effect of a subsequent marriage with the mother, in so far as it affects the right of the child to inherit real property in another State, since the descent of real estate is governed by the law of the situs.

3. SAME—*law legitimating child is a rule of property.* Section 3 of the Statute of Descent, which provides that an illegitimate child whose parents have intermarried and whose father has acknowledged him as his child shall be legitimate, is a rule of descent of real property, and one bringing himself within the rule may inherit land in Illinois even though he could not inherit land in the State where the father resided at the birth of the child.

4. PARTITION—*when court cannot refuse partition.* Where the rights of minors are not involved a court of equity cannot refuse to grant partition if the parties have brought themselves within the provisions of the statute authorizing the same.

5. SAME—*decreeing partition before estate is settled is not reversible error.* Entering a decree for partition or sale before the estate is finally settled is not reversible error although the practice is not approved, but in case a sale is ordered the personal representative should be brought into court, and the court should control the time of sale, or the funds arising therefrom, to protect the interests of creditors of the estate. (WILKIN, CARTWRIGHT and HAND, JJ., dissenting.)

APPEAL from the Circuit Court of Peoria county; the Hon. N. E. WORTHINGTON, Judge, presiding.

ARTHUR KEITHLEY, for appellant.

SHEEN & MILLER, for appellee.

Mr. CHIEF JUSTICE RICKS delivered the opinion of the court:

This is an appeal from the decree of the circuit court of Peoria county for partition, growing out of a conceded state of facts and involving but two points of law. The principal question is as to the heirship of appellee, Daisy Gabbert. The only other question presented is as to the right to file a bill for partition before the estate of the deceased is settled in the probate court.

The facts in reference to the heirship of appellee are substantially as follows: On November 23, 1873, and some time prior thereto, one Alice Hannahs resided in Cincinnati, Ohio, and on the date last named gave birth to appellee in that State. In July, 1874, the intestate, William C. Hall, was arrested in Cincinnati on the charge of bastardy, upon the complaint of said Alice Hannahs imputing to him the paternity of appellee. This proceeding was settled by the marriage of appellee's mother and the said Hall on July 9, 1874, and immediately after the marriage said Hall left Cincinnati and never lived or cohabited with the said mother of appellee after the said marriage ceremony. Appellee, when but an infant, was committed to a children's home in Cincinnati where she remained until she was five years old, when she was adopted by a Mr. and Mrs. Beuhla, who removed to California, taking appellee with them, and appellee continued to reside in that State from that time. So far as appellee could remember she never saw her father nor heard directly from him until the fall of 1898, when she sent a letter to the chief of police of Pekin, Illinois, the then home of her father, inquiring of his whereabouts. This letter was shown to the father by the chief of police, and thereupon the father admitted the paternity of the child; told the chief that in 1873, and prior to that time, he was working in the railroad yards in Cincinnati; that he kept company with appellee's mother;

that they were engaged to be married and that by him appellee's mother became pregnant; that the marriage was put off from time to time until appellee's mother had given birth to appellee, when he was arrested upon the charge of bastardy, and that he married appellee's mother in settlement of that charge and deserted the mother and child, leaving Cincinnati and in the year 1875 settling in Pekin. He further stated that the mother of appellee died in 1878, and that after her death he returned to Cincinnati and went to the old home and endeavored to find appellee; that he traced her to the children's home and there learned of her adoption but was refused the names or whereabouts of the persons that had adopted her, as the rule was that such information should not be given except with the consent of the persons adopting a child from such establishment. The father, after the death of the appellee's mother, again married, and his widow, Vallie R. Hall, and his son by his last marriage, John William Hall, survived him. After receiving the information of the whereabouts of appellee her father immediately began correspondence with her, addressing her as "My dear daughter" and closing his letters with the expression "Your father," and during the fall of 1898 wrote letters to the children's home at Cincinnati for the purpose of verifying her history, enclosing the letter of inquiry, and following his signature to the letter with the words, "Her father." In the fall of 1898 or winter of 1898 and 1899 appellee's father and his then wife went to California and visited four weeks with appellee, and he there declared himself the father of appellee and her his child. He brought appellee home with him on that occasion, to Peoria, where he then resided, and introduced her to various and numerous friends as his daughter, stating that he was glad and proud he had found her. From the time he first learned of her whereabouts until the time of his death they continuously corresponded. In the fall of 1900 appellee's father and his said wife went to California for the health of the husband, stopping part of

the time with appellee. While in California said Hall died intestate, seized of the real estate in Peoria in controversy.

The original certificate of marriage and duly authenticated copy of the record of marriage of said William C. Hall and Alice Hannahs were admitted in evidence, as were also the letters, declarations and admissions of said William C. Hall as to his paternity of appellee, and the details of the circumstances attending and surrounding her birth and identity as given by Hall. No complaint is made as to the admissibility of this evidence or any of the evidence contained in the record, the principal controversy being, so far as the question of heirship is concerned, that if it be admitted that all the evidence shows or fairly tends to show is true, still appellee cannot take an interest in the real estate in question, because, it is claimed, the evidence fails to show that the father recognized appellee as his child during the existence of the marriage relation between himself and the appellee's mother, and that the recognition of appellee by her father in 1898 and 1899 did not have the legal effect intended by our statute for the purpose of legitimating children born out of wedlock. It is further contended by appellant that upon this record appellee cannot be held, under our statute, to have been legitimated by the marriage of appellee's father and mother in Ohio, for the reason that there are certain depositions in the record showing that at the time of the birth of the appellee the domicile of said William C. Hall was at Pierceville, in the State of Indiana, and that the law as applied to illegitimates is, that the domicile of the father at the time of the birth of the child determines its capacity to be legitimated by a subsequent marriage, and that this record contains no evidence showing that at the time of the birth of appellee the laws of Indiana recognized such method, or any method, of the legitimation of bastard children.

In support of the contention of appellant two cases are relied upon: *Munro v. Munro,* 1 Rob. (Scot. App. H. L.) 492, and *Blythe v. Ayres,* 96 Cal. 532, (19 L. R. A. 40.) In

both of these cases the birth was in England, and by the laws of that country the status of illegitimacy was so indelible it could only be removed and the child be legitimated by an act of parliament. In the *Munro case* a Scotch gentleman bore illicit relations with an English woman in England, through which a child was born, and the parents subsequently married in England and the father recognized the child as his child. The mother and the child remained in England until after the death of the father. Upon the death of the latter the child claimed heirship by the laws of Scotland. In the *Blythe case* an illegitimate child was born of the bodies of Thomas H. Blythe and Julia Perry while the mother was a resident of England. The father, after the conception and prior to the birth, left England and came to America and settled in California. The mother and child remained in England until after the death of the father. The latter died possessed of a large estate in California and the child asserted heirship. In the code of California two distinct provisions existed relative to illegitimates. The first, as section 230, seemed to relate solely to legitimation of such children, and provided that it might be done by the public recognition of the child by the father and receiving the child into his family with the consent of his wife, if married, and otherwise treating the child as his child. The other was section 1387 of the code, which was a statute of descent, and provided that if the father recognized, in writing signed by him and witnessed by a competent witness, an illegitimate child as his child, the child should be his heir. It was found as a fact in the *Blythe case* that the father had publicly acknowledged the child; that he had no family, but that he treated the child as his child; and it was further found, under section 1387, that by a writing, in the presence of two witnesses, he acknowledged himself to be the father of the child. In both the *Munro* and *Blythe cases* the children were held to be legitimated. In the *Munro case,* to avoid the irrevocable rule of bastardy obtaining under the English law, the House

of Lords reached the conclusion of legitimation by what seems to us a refinement of reasoning, which was, in effect, that although by the law of England the child was a bastard when born, the fact that the father was domiciled in Scotland at the time of the birth and that the laws of Scotland recognized legitimation by subsequent marriage gave the child the capacity to be legitimated by the English marriage so as to take property under the laws of Scotland.

The reasoning in the *Munro case* is to some extent and on one phase of the case adopted and followed in the *Blythe case* by the Supreme Court of California. The provision of section 230 of the California code was not that the child should be the heir in case of the public acknowledgment and receiving into the family, but that the father by such acts "thereby adopts it, and such child is thereupon, for all purposes, legitimate from the time of its birth." It will be observed that section does not purport to confer any property right but to declare a certain status of the child, and under that section of the code the *Munro case* was discussed and the reasoning followed. The exact language of section 1387 is: "Every illegitimate child is an heir of any person who, in writing, signed in the presence of a competent witness, acknowledges himself to be the father of such child." When the court comes to the consideration of the right under that section it says: "It is unnecessary to decide whether this provision affects the status of a child or whether it is alone a statute of descent. If it either directly or indirectly touches upon the status, our views as herein previously expressed are applicable. If it is a statute of descent pure and simple,— and *Estate of Magee,* 63 Cal. 414, seems to so declare in express terms,—then the plaintiff is entitled to all the benefits of it, regardless of domicile, status or extra-territorial operation of State laws." The above quotation thus clearly points out the distinction between the cases where the status of a child is the question to be determined and the conflicting laws of descent in a given case.

It may be further said of the *Munro case,* while in that case the principle that the domicile of the father in the country where the rule of legitimation *per subsequens matrimo-nium* is adopted at the time of the birth of the child gives the child capacity to be legitimated by a marriage in the country where that rule does not obtain was given weight, it may well be inferred from the remarks of Lord McKenzie that the decision would have been the same without its application. He said: "I cannot help entertaining doubt whether the indelibility of English bastardy has any meaning beyond this: that an English bastard is not legitimated by an English marriage. * * * But suppose it were true that English bastardy is indelible, not only against a marriage in England, but against a marriage all the world over; I say, suppose there was produced a statute providing and declaring that an English bastard born in England should remain a bastard all the world over, notwithstanding anything that could be done in any country; I ask, could we give it effect? Could we acknowledge the authority of such a statute? I think we will be bound to say that the English parliament might rule the fate of the bastards in England but that its laws were not entitled to extend to other countries, and that there was no principle of the law of nations which would give effect to such a statute."

In the case at bar the statute of Ohio was introduced, and by its provisions, in force at the birth of appellee, the marriage of the father to the mother and the acknowledgment of the child by him legitimated the child, and, if it were deemed essential, we think it might well be held, under the circumstances of this case, that the marriage of William C. Hall to appellee's mother was an acknowledgment of this child during the marriage. He, as the putative father, was arrested, charged with its paternity, and put an end to the prosecution by marrying the mother. The courts will not indulge the presumption, in such case, that the marriage was entered into merely to avoid the possible consequences of the pro-

ceeding, but will rather assume that had the alleged father doubted his paternity of the child he would have resisted the prosecution and refused the marriage. *Brock* v. *State,* 85 Ind. 397.

While the record does state the conclusion of witnesses or the assertion of the fact by them that the residence of the appellee's father was in Pierceville, Ind., at the time of her birth, it also unquestionably shows by his admission and by other evidence that at the time of his keeping company with appellee's mother, the time of her pregnancy and the time of his arrest he was working in the railroad yards in Cincinnati. He was a single man, and his residence was wherever he wished to make it. As we have said, however, we do not regard this question as controlling. The question here presented is not one merely affecting the civil status, but is a question of descent and heirship of real estate. The descent of property, and real estate in particular, in a state or nation is governed by the law of the situs. (3 Washburn on Real Prop.—3d ed.—sec. 32, p. 16; Tiedeman on Real Prop. sec. 664; *Keegan* v. *Geraghty,* 101 Ill. 26; *Stoltz* v. *Doering,* 112 id. 234; *United States* v. *Fox,* 94 U. S. 315.) In the latter case it is said (p. 320) : "It is an established principle of law, everywhere recognized, arising from the necessity of the case, that the disposition of immovable property, whether by deed, descent or in any other mode, is exclusively subject to the government within whose jurisdiction the property is situated."

Where the question is as to the right to take real estate in this State under our laws of descent, the fact that the claimant may be qualified to take, as heir, under the laws of another State or sovereignty of which he is or has been a citizen, will not enable him to take under the laws of this State unless those laws comply with the terms and requirements of our own law. (*Keegan* v. *Geraghty, supra; Stoltz* v. *Doering, supra.*) On the other hand, it cannot be material that the claimant could not inherit under the laws of some other State

or country; if he bring himself within the requirements and provisions of the statutes and laws of this State he may take according to them.

The statute under which appellee claims is section 3 of chapter 39 of the Revised Statutes, and the act is entitled "An act in regard to the descent of property." The section reads: "An illegitimate child, whose parents have intermarried, and whose father has acknowledged him or her as his child, shall be considered legitimate." And under our law, when a child is legitimated he takes under our Statute of Descent, whether that legitimation arises from birth in wedlock or subsequent marriage and acknowledgment of a child born out of wedlock,—in other words, without any distinction as to the rights of inheritance of legitimates. This section, placed as it is, cannot be construed as merely fixing the status of appellee, but is a rule of descent.

A citizen of our State, possessed of real estate in it, has died intestate, and the question is, to whom, under our statute, does his property descend? The law says it shall descend to his children. It recognizes that he may have two classes of children: legitimate children and illegitimate children. It also recognizes that by the doing of certain acts the illegitimate child may become legitimate, and then he will have but one class, and between that class of legitimates there is no distinction of right of descent or inheritance. As we view the law, it is immaterial what the laws of Indiana or Ohio, or any other country, are or were. We look to our own law and read it as it is written; then to the facts, and if the facts bring the claimant within our law then he is entitled to its benefits, whatever may be his status elsewhere. We do not find in our law the requirements that the father shall acknowledge the child during the lifetime of the mother, nor do we find that, in order to make an acknowledgment such as will legitimate the child, the law of the domicile of the father at the time of the birth of the child must have recognized such form of legitimation. In a republic consisting of

as many independent commonwealths as does ours, with each commonwealth invested with the power of determining the rules of descent and heirship within its borders and with the people constantly changing from one to the other, if we should be called upon to determine the rights of descent of real estate in our own State by the legal status of claimants as affected by the laws of other States, any rules that we might attempt to adopt would be both unsettled and uncertain.

It is stipulated in this case that Vallie R. Hall, the widow of the intestate, had a claim allowed in her favor against the estate of her deceased husband in excess of $6000; that at the instance of appellee the order allowing said claim was set aside by the probate court, and that the matter is pending on appeal in the circuit court. Upon this state of facts the appellant urges that it was error for the chancellor to have decreed partition until the settlement of the estate of the decedent.

The parties in interest in the land are adults. The right of partition is fixed by statute, and where the rights of minors or infants are not involved the court may not refuse to declare the rights of the parties claiming to be owners of the land and decree partition among them according to their rights. (21 Am. & Eng. Ency. of Law,—2d ed.—1146; *Hill* v. *Reno,* 112 Ill. 154; *Martin* v. *Martin,* 170 id. 639; *Ames* v. *Ames,* 148 id. 321; *Trainor* v. *Greenough,* 145 id. 543; *Wachter* v. *Doerr,* 210 id. 242.) The appellant, John W. Hall, denied and contested the right and claim of appellee to heirship. He urged her illegitimate birth and denied that she had been legitimated within the requirements of our law. She was not shown on the files of the estate as an heir, and it was proper that she should timely bring and prosecute her suit, which would fix her rights. While the practice is not approved or commended of making actual partition or sale under such proceeding prior to the settlement of estates, we are not prepared to hold, under our statute, that a decree for either is reversible error. The creditor cannot be injured

thereby, for if actual partition is had the lands are still sub-
ject to sale, and if a sale in partition is had the purchaser
likewise takes subject to the charge of the debts of the ances-
tor, and the rule *caveat emptor* applies. (*Sutton* v. *Read,* 176
Ill. 69; *Bassett* v. *Lockard,* 60 id. 164.) If the owners of
these lands could agree and should make partition among
themselves no one would question that it would be a good
and valid partition, *non constat* the estate of the ancestor is
unsettled. The statute points out when partition may be had,
and the contents of the bill or petition, so far as the legisla-
tive body deemed the same essential, are prescribed. (Rev.
Stat. chap. 106, secs. 1, 5.)

Section 1 of chapter 106 expressly confers the right upon
those who have derived their title by descent. That can only
occur where the ancestor dies intestate and the title passes by
operation of law. If it had been the legislative intent that
the right should only be exercised by those who derive title
by descent after the period allowed by law for the filing of
claims against the estate of the ancestor, that intention would
have been manifested in some manner or by some language
contained in the statute. Nothing of the kind appears, and
we can find no warrant for the court reading into the statute
additional requirements. Many of the States have by statute
prohibited the institution of a proceeding for partition before
the expiration of the time within which the estate of decedent
should be settled. Not so in this State. Appellant and appel-
lee are the owners of the land charged with the payment of
the debts of the ancestor and the widow's rights. As owners
they are entitled to the beneficial use of it. If one shall chance
to be in exclusive possession at the death of the ancestor and
deny the right of the other, it would seem a harsh rule, in the .
absence of some positive requirement of law, to say his right
should be postponed until the settlement of the estate. Here
the ancestor died in December, 1900, and the present bill was
not filed till September, 1902,—nearly two years thereafter.
In June, 1903, the estate was still unsettled, and it is com-

mon knowledge that many estates are four or five years in process of settlement.

It is suggested that the holding in *Wachter* v. *Doerr,* 210 Ill. 242, is in conflict with the holding in this case as to the right of partition before the settlement of the estate. The decree for partition entered in that case was reversed for the reason that the answer and the evidence disclosed the absence of necessary parties. Upon the question now before us it was there said (p. 245) : "In some States a proceeding for partition before an estate has been settled or the time allowed for that purpose has expired has been held to be premature, and in others a suit for partition before that time is prohibited by statute. (21 Am. & Eng. Ency. of Law,— 2d ed.—p. 1174.) We have not held that the proceeding cannot be instituted, but have condemned the practice of taking decrees before it can be known whether or not it will be necessary to sell the land to pay debts." We do not think the cases are in conflict.

The chancellor, in case a sale is ordered, should require the administrator of the estate to be brought before the court and control the time of sale, or the funds arising from the same, so that the creditors of the estate may have the benefit thereof.

The decree of the circuit court is affirmed.

*Decree affirmed.*

WILKIN, CARTWRIGHT and HAND, JJ., dissenting: We adhere to the decisions in the cases of *Sutton* v. *Read,* 176 Ill. 69, and *Wachter* v. *Doerr,* 210 id. 242, which, as we understand, were not intended as advisory, merely, but as decisions of the court on a question of law and practice.