[S. F. No. 17000. In Bank. May 31, 1945.]

Estate of ANDREW LUND, Deceased. BERT A. LUND, Appellant, v. FRANK LUND, Individually and as Guardian, etc., Respondent.

474

Robert E. Hatch and Giannini, Callahan & Giannini for Appellant.

Simeon E. Sheffey for Respondent.

SCHAUER, J.—Bert A. Lund, petitioner herein, appeals on a settled statement from an order denying his petition to determine heirship. Petitioner was born the illegitimate (it is assumed) son of Andrew Lund, now deceased, from whom he seeks to inherit. He was received into his father's family, with the consent of the father and his wife (not petitioner's mother), while they were domiciled in another state, and thenceforth was publicly acknowledged and in every respect treated by his father as a legitimate son. The father died a resident of California, leaving estate herein. The family status and relationship do not appear ever to have been disavowed. We have concluded that by virtue of the provisions of section 230 of the Civil Code, upon the facts shown, petitioner is entitled to share in the estate of decedent pursuant to the statutes of descent of California.

Petitioner was born in Norway in 1883. His father (decedent) and mother are not shown to have ever married and for the purposes of this opinion we assume that the evidence establishes that they did not marry. Decedent came to Minnesota and married another. There were two children of the

marriage, Lillian Blanche and Frank. In 1904 petitioner, at the request of decedent and his wife, came from Norway to Minnesota and was received into the family with the consent of the wife and publicly recognized and acknowledged by decedent as a son. In 1906 decedent moved to New Mexico; he took petitioner with him and the rest of the family soon joined them; petitioner continued to live as a member of the family and was publicly recognized and acknowledged by decedent as a son. It does not appear that this publicly established family status (whatever its legal effect) was ever broken up or disavowed prior to decedent's death. Petitioner was known by the name "Lund" in Norway. Although his mother's name was Anderson he came to this country under the name "Lund," and has continued to use it.

In 1941 Andrew Lund, the father, then a resident of California, died, leaving estate herein. It does not appear exactly when decedent became a resident of this state or, expressly, that petitioner did or did not join his father in becoming domiciled in California. Petitioner, it appears, was of adult age before the family moved to California—in fact, before they moved to New Mexico—but there is no showing that he ever married or established a separate domicile. It does appear that his half-brother and half-sister are residents of this state and he is now appearing in the courts of this state, invoking their jurisdiction.

Decedent left a will which devised all his estate to his son Frank Lund and his daughter Lillian Blanche Imel. Such will was admitted to probate. Petitioner, who was not mentioned or provided for in the will, claims that he, as pretermitted heir, is entitled to share in the distribution of the estate.

Statutes under which a child born illegitimate can, by virtue of subsequent conduct of his father (or of both parents) become capable of inheriting from the father, are usually classified as either statutes of legitimation (under which the child can, in some jurisdictions, attain the full status of legitimacy) or statutes of succession (under which the child, although remaining illegitimate in social status, can, at least to a limited extent, inherit as if he were legitimate, or, as is sometimes said, under which he is legitimated for the purpose of inheritance only). (See, e.g., *Pfeifer* v. *Wright* (1930, C.C.A. 10), 41 F.2d 464 [73 A.L.R. 932], cert. den. 282 U.S. 896 [51 S.Ct. 181, 75 L.Ed. 789]; 2 Beale, Conflict of Laws (1935) § 246.2, p. 967; Rest., Conflict of Laws, § 246, p. 329,

and comments thereto.) ▮ Whether a child shall succeed to the estate of his father is determined in the case of land by the law of the situs of the land (Civ. Code, § 755; *Campbell-Kawannanakoa* v. *Campbell* (1907), 152 Cal. 201, 206 [92 P. 184]; *Estate of Loyd* (1917), 175 Cal. 699, 705 [167 P. 157]; *Estate of Hills* (1917), 176 Cal. 232, 234 [168 P. 20]; *Hall* v. *Gabbert* (1904), 213 Ill. 208 [72 N.E. 806]) and in the case of movables by the law of the domicile of the father at the time of his death unless the law of the situs of the property provides that the law of the decedent's domicile shall not govern (Civ. Code, § 946; *Estate of Apple* (1885), 66 Cal. 432, 434 [6 P. 7]; *Collins* v. *Maude* (1904), 144 Cal. 289, 294 [77 P. 945]; *Estate of Dwyer* (1911), 159 Cal. 680, 683 [115 P. 242]; *Estate of Lathrop* (1913), 165 Cal. 243, 247 [131 P. 752]; *Estate of Hodges* (1915), 170 Cal. 492, 495 [150 P. 344, L.R.A. 1916A 837]). As to what law governs (as precluding, permitting, or creating) the attainment of the full status of legitimacy, the reports of decisions and the texts of academic writers disclose a wide and heterogeneous conflict of authority and uncertainty of theory. As appears later herein it is upon the particular theory and policy adopted in California that the determination of this case depends.

At the time the family of Andrew Lund resided in Minnesota there was in that state no statute whereby petitioner could, by virtue of the father's receiving him into the family, etc., attain the status of legitimacy or otherwise become capable of inheriting from the father. And at the time the family moved to New Mexico the only statute there pertinent (N.M. Comp. Laws, 1897, § 2038) declared that illegitimate children shall, *when there are no legitimate children,* inherit from the father whenever they have been recognized by him as his children, provided that such recognition must have been general and notorious, or else in writing. The exception when the father left legitimate children was eliminated by amendment in 1915 (N.M. Laws, 1915, ch. 69, § 1). Whether at that date Andrew Lund and his family were still residing in New Mexico or had moved to California does not appear from the record before us. ▮ In any event the New Mexico statute probably is not applicable here and is not relied upon by us because although the Supreme Court of New Mexico, so far as our research discloses, has not had occasion to decide whether the statute above referred to (later N.M. Comp.

Stats. 1929, § 38-114, now N.M. Comp. Stats. 1941, §31-118) is a statute of succession as opposed to a statute regulating status, it has consistently referred to the section as a statute of descent (*State* v. *Chavez* (1938), 42 N.M. 569 [82 P.2d 900]; *In re Gossett's Estate* (1942), 46 N.M. 344 [129 P.2d 56, 142 A.L.R. 1441]) and we should probably feel constrained to regard such references as at least tending to show an interpretation of the statute placed on it by the courts of the state in which it is enacted, which interpretation we should therefore respect (*Osborne* v. *Home Life Ins. Co.* (1899), 123 Cal. 610, 612 [56 P. 616]). As a statute of descent it would be immaterial to a determination of the legitimacy status of petitioner in California.

We regard the record here as disclosing no facts which would bring the petitioner within any operative statute of succession otherwise than through legitimation. It thus becomes obvious, from the principles and facts above stated, that the right, if any, of petitioner to inherit from his father depends exclusively on the law of California and that such right, if existent, derives necessarily from our statute of legitimation. In other words, the ultimate question is: Under the laws of California is petitioner legitimated in relation to his father? The reasons which impel our affirmative answer to this question appear in the discussion which follows.

As previously stated there is a wide and heterogeneous conflict in authority and theory as to what law governs the attainment of the status of legitimacy. Support may be found for at least five different theories: (1) the law of the domicile of the father at the time of the birth of the child; (2) the law of the domicile of the father at the time of his legitimating acts; (3) the law of the place where the legitimating acts occurred; (4) the law of the domicile of the child (of its mother) at birth; (5) the law of the situs of property, succession to which depends on the status of legitimacy in that jurisdiction. (See, e.g., authorities cited and discussed in 65 L.R.A. 177; 10 C.J.S. § 22, p. 102; Story, Conflict of Laws (1883) §§ 93-93v, pp. 117-152; 1 Wharton, Conflict of Laws (1905) §§ 240-248, pp. 535-545; 2 Beale, Conflict of Laws (1935) §§ 139.1-140.1, pp. 706-712; Stumberg, Conflict Laws (1937) pp. 302-306; Goodrich, Conflict of Laws § 137, pp. 370-376, 73 A.L.R. 941; *Wolf* v. *Gall* (191ɔ, Cal.App. 286, 288 [163 P. 346, 350]; *Blythe* v. *Ayres* (18ɔ

96 Cal. 532 [31 P. 915, 19 L.R.A. 40] ; *Hall* v. *Gabbert* (1904), *supra,* 213 Ill. 208 [72 N.E. 806] ; *Franklin* v. *Lee* (1901), 30 Ind.App. 31 [62 N.E. 78] ; Annotation, L.R.A. 1916 E, p. 666.)

It is contended here that California has no jurisdiction over the status of the relationship of Andrew Lund and the petitioner in that, it is asserted, neither father nor child was domiciled here at the time of the child's birth or at the time the cognizable legitimating acts took place, and that such acts were not performed in California. It is also contended that the legitimation of a child must be effected during his minority or not at all. Upon the record before us we are satisfied that neither of respondent's contentions should be sustained.

The divergence in authorities pointed out above reflects not only the personal attitudes of the justices of the various courts as being conservative or liberal in their interpretation and application of the statutes of the particular states they serve but also is grounded in the respective fundamental policies of those states on the subject of bastardy. On this subject the controversy is as old and deep-rooted as is the conflict between common law and civil law.

The common law was antagonistic to both adoption and legitimation of children and its effect appears in many jurisdictions. As stated in *In re Riemann's Estate* (1927), 124 Kan. 539, 542 [262 P. 16, 17], "Not only may different statutes constrain different judicial conclusions on questions of law pertaining to the incidents and consequences attaching to the adoption of children, but the hostile attitude of the common law towards the whole subject of legitimation and adoption of children is not unlikely to be reflected in the decisions of great American courts which adhere to the common law tradition." ▇ At common law an illegitimate child "was held to be *filius nullius* or *filius populi,* it was without right even to the name of its natural father, and being without inheritable blood it could acquire nothing except by its own efforts" (*Pfeifer* v. *Wright* (1930, C.C.A. 10), *supra,* 41 F.2d 464 [73 A.L.R. 932, 935]), or, as succinctly phrased by Mr. Presiding Justice Peters (in *Estate of Paterson* (1939), 34 Cal.App.2d 305, 309 [93 P.2d 825]), "At common law illegitimates are the sons of nobody. They have no inheritable blood in them." The only method of legitimation under the common law in England was by special act of Parliament.

(*Pfeifer* v. *Wright, supra.*) The Roman law, however, adopted a more tolerant and liberal view. It provided various modes for legitimation of bastards: "(1) By subsequent marriage of the father and mother; (2) per oblationem curiae, whereby the parent consecrated his child to the use of the state; (3) under the Emperor Anastasius, by adoption merely. This law was, however, abolished by Justin and Justinian. (4) By the last will of the father, confirmed by the emperor. (5) By a special dispensation from the emperor, granted upon the father's petition. (6) By recognition on the part of the father." (7 C.J. § 17, p. 947, note 97[c].)

In jurisdictions espousing the strict common-law philosophy it is argued that it is meet to visit the sins of the fathers upon the children and that it tends to discourage bastardy if illegitimate children are denied any right of inheritance or support or recognition from the father. Few jurisdictions adhere absolutely to this rigorous rule. "From an early day the states [at least some of them] began to regard and deal with this unfortunate condition [illegitimacy] in a more humane and just way, as did the civil law (see Brightly's notes to *Stevenson* v. *Sullivant,* 5 Wheat. 207, 5 L.Ed. 70), which provided several methods by which the child's status could be changed to that of a lawful child, thus effecting legitimation and placing the child in all respects upon the same footing as if begotten and born in wedlock. . . . Its civil and social status becomes that of a lawful child of the natural father, and the child and father thereafter stand in their relations to each other as though the birth had been during wedlock." (*Pfeifer* v. *Wright* (1930, C.C.A. 10), *supra,* 41 F.2d 464, 465 [73 A.L.R. 932, 935].) The view of the common law has given way in large measure to the concept that the onus for the act of the parents cannot be visited justly upon the child and that placing responsibility for the support of the child upon the father equally with the mother, permitting it to become legitimated and to have a right to his name and to inheritance from him, will tend as well or better to deter the potential father than did the common-law doctrine of irresponsibility, and at the same time conform more closely to our present ideas of justice. Indeed, aside from considerations of justice, it may be suggested that the complete freedom from legal responsibility for illegitimate children, which the common law afforded the father, may have been a doctrine which to the male in licen-

tious moments was more encouraging than deterrent, and were better abandoned.

Many states now have laws subjecting the father of an illegitimate child to liability for its support (see, e.g., Cal. Civ. Code, §196a; Iowa Code, 1939, §12667.01); many have provisions by which the illegitimate may upon various conditions inherit from the father (see, e.g., Cal. Prob. Code, § 255; Colo. Ann. Stats., 1935, ch. 176, § 8; Ind. Ann. St., 1933, § 6-2309; Maine Rev. Stats., 1930, ch. 89, § 3); many have enacted statutes by which the illegitimate may attain the full status of legitimacy upon varying conditions (such as subsequent marriage of the parents, in some states dependent upon accompanying express acknowledgment of paternity [see, e.g., Ala. Code, 1940, tit. 27, § 10; Ind. Ann. Stats., 1933, § 6-2310] and in some jurisdictions regardless of such acknowledgment [see e.g., Cal. Civ. Code, § 215; Iowa Code, 1939, § 10444; Mont. Rev. Code, 1921, § 5852]; public acknowledgment by a father, without marriage of the mother, but accompanied by receipt of the child into his family and treatment as a legitimate child); some states by fiat decree the legitimacy of children born of a marriage void at law (see, e.g., Cal. Civ. Code, § 85; Kan. Gen. Stats., 1935, §23-124); and some states have adopted substantially universal legitimation laws.*

It cannot be seriously disputed that the public policy of California disavows the common-law tenets and favors legitimation. A marriage annulled is held to be void *ab initio;* a decree of nullity is a determination that the marriage never

---

*See Ariz. Ann. Code, 1939, § 27-401, which provides that ''Every child is the legitimate child of its natural parents and is entitled to support and education as if born in lawful wedlock, except the right to dwelling or a residence with the family of its father, if such father be married. It shall inherit from its natural parents and from their kindred heir, lineal and collateral, in the same manner as children born in lawful wedlock. This section shall apply to cases where the natural father of any such child is married to one other than the mother of said child, as well as where he is single.'' Section 27-402 provides ''that the mother of said child shall not be a competent witness [to establish parentage] if the alleged natural father of said child is dead at the time of the trial.''

See also Ore. Stats., ch. 269, Gen. Laws of 1925, which provides that ''In case a man and woman, not otherwise married heretofore, shall have cohabited in the state of Oregon as husband and wife, for over one year, and children shall be living as a result of said relation, said cohabitation, if children are living, is hereby declared to constitute a valid marriage and the children born after the beginning of said cohabitation are hereby declared to be the legitimate offspring of said marriage.'' This act is held to be retrospective in operation. (*Wadsworth* v. *Brigham* (1928), 125 Ore. 428, 459-460 [259 P. 299, 266 P. 875, 877].)

existed as a valid marriage. (*Millar* v. *Millar* (1917), 175 Cal. 797, 805, 807 [167 P. 394, Ann.Cas. 1918E 184, L.R.A. 1918B 415] ; *Withers* v. *Superior Court* (1928), 91 Cal.App. 735, 737 [267 P. 547].) But "A judgment of nullity of marriage does not affect the legitimacy of children conceived or born before the judgment . . ." (Civ. Code, § 84) and "The issue of a marriage which is void or annulled . . . is legitimate" (Civ. Code, § 85). "All children born in wedlock are presumed to be legitimate" (Civ. Code, § 193) ; "All children of a woman who has been married, born within ten months after the dissolution of the marriage, are presumed to be legitimate children of that marriage" (Civ. Code, § 194) ; "The father as well as the mother, of an illegitimate child must give him support and education suitable to his circumstances" (Civ. Code, § 196a) ; "If a parent chargeable with the support of a child dies, leaving it chargeable to the county, and leaving an estate sufficient for its support, the supervisors of the county may claim provision for its support from the parent's estate by civil action" (Civ. Code, § 205) ; "A child born before wedlock becomes legitimate by the subsequent marriage of its parents" (Civ. Code, § 215) ; and "The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed *for all purposes legitimate* from the time of its birth. The foregoing provisions of this chapter [entitled "Children by Adoption"] do not apply to such an adoption" (Civ. Code, § 230). (Italics added.)

The last quoted statute is that upon which petitioner relies. It is, on its face, primarily a law governing legitimation or status but if under it the petitioner has attained the status of legitimacy "for all purposes" in California then he is entitled to the benefit of the general succession statutes.

In some of the cases and texts there appears considerable confusion in the differentiation and respective applications of statutes of succession and statutes of legitimacy. It seems to be the concept of some authors that a statute of succession may be given application in situations where a statute of legitimacy would be wholly inoperative. Yet in truth the statute of legitimacy is the broader law. While a statute of succession is just a law of devolution of property,

and no more, a statute of legitimacy is, in effect, all of that and more. The attainment of the full and unqualified status of legitimacy carries with it as an incident thereof the right to inherit. Certainly, then, a sovereign state should be no less zealous or unfettered in the application of its legitimation statutes than of its pure descent statutes.

In respondent's argument that the rights of petitioner as to status, and consequentially his right to inherit from his father, are not to be determined by California law, stress is laid on the proposition stated in 11 American Jurisprudence, Conflict of Laws, page 319, section 21, that "The general rule is that the law of the father's domicil at the time of the legitimating act will be the proper law to determine the status of both parent and child. The father must, at the time of the acts of legitimation, be domiciled in a jurisdiction wherein those acts are recognized as legally sufficient. They will not, on his subsequently becoming domiciled in a jurisdiction in which they are sufficient, be permitted to operate nunc pro tunc as a legitimation in the latter jurisdiction."

The same assertedly general rule is stated in the Restatement, Conflict of Laws, page 207, section 140, as follows: "An act done after the birth of an illegitimate child will legitimize the child as to a parent from the time of the act if the law of the state of domicil of that parent at that time so provides. . . . The law must be that of the state in which the parent is domiciled at the time of the act; it is not enough that he later becomes domiciled in a state whose law provides for the legitimizing upon the doing of the act." (See, also, e.g., 5 R.C.L. § 14, p. 920; *In re Presley's Estate* (1925), 113 Okla. 160 [240 P. 89]; *Pfeifer* v. *Wright* (1930, C.C.A. 10), *supra*, 41 F.2d 464 [73 A.L.R. 932, 941]; 10 C.J.S. 51; *cf. Hall* v. *Gabbert* (1904), *supra*, 213 Ill. 208 [72 N.E. 806]; *Franklin* v. *Lee* (1901), *supra*, 30 Ind.App. 31 [62 N.E. 78].)

That the above stated "general rules" are followed in some jurisdictions (see, e.g., *Eddie* v. *Eddie* (1899), 8 N.D. 376 [79 N.W. 856, 73 Am.St.Rep. 765, 769]) is fully recognized but it must also be recognized that the subject of legitimation, as well as that of succession to property, is a proper one for state legislation. As stated in 10 C.J.S. page 54, section 10, "The legislative power to legitimate, or to provide for the legitimation of, a bastard has long been recognized both in England and in the United States. Such legitimation can be effected without the fact or fiction of a

marriage by a simple fiat.'' And such statutes, being remedial, may even be applied retrospectively. (*Wadsworth* v. *Brigham* (1928), *supra*, 125 Ore. 428 [259 P. 299, 266 P. 875].)

Chief Justice Gray in *Ross* v. *Ross* (1880), 129 Mass. 243, 246 [37 Am.Rep. 321], well states the rule and recognizes the right of states to independently legislate upon the subject. He says: ''It is a general principle, that the status or condition of a person, the relation in which he stands to another person, and by which he is qualified or made capable to take certain rights in that other's property, is fixed by the law of the domicil; and that this status and capacity are to be recognized and upheld in every other State, *so far as they are not inconsistent with its own laws and policy.''* (Italics added.)

In *Hall* v. *Gabbert* (1904), *supra*, 213 Ill. 208 [72 N.E. 806], the Supreme Court of Illinois had before it a question as to the heirship of one Daisy Gabbert, who was born in Ohio, out of wedlock, the natural child of Alice Hannahs and the intestate, William C. Hall. After Daisy's birth her parents intermarried in Ohio. Her right to inherit in Illinois depended on her status as a legitimate child of her father. The court expressly disregarded the law of Ohio, which in construction and application was claimed to be dissimilar to the Illinois law. It declared (at pp. 808-809 of 72 N.E.): ''The statute under which appellee claims is section 3 of chapter 39 of the Revised Statutes (Hurd's Rev. St. 1903), and the act is entitled 'An act in regard to the descent of property.' The section reads: 'An illegitimate child, whose parents have intermarried, and whose father has acknowledged him or her as his child, shall be considered legitimate.' And under our law, when a child is legitimated he takes under our statute of descent, whether that legitimation arises from birth in wedlock or subsequent marriage and acknowledgment of a child born out of wedlock; in other words, without any distinction as to the rights of inheritance of legitimates. This section, placed as it is, cannot be construed as merely fixing the status of appellee, but is a rule of descent.

''A citizen of our state, possessed of real estate in it, has died intestate, and the question is, to whom, under our statute, does his property descend? The law says it shall descend to his children. It recognizes that he may have two classes of children—legitimate children and illegitimate children. It also recognizes that by the doing of certain acts the il-

legitimate child may become legitimate, and then he will have but one class, and between that class of legitimates there is no distinction of right of descent or inheritance. As we view the law, it is immaterial what the laws of Indiana or Ohio, or any other country, are or were. We look to our own law, and read it as it is written; then to the facts, and, if the facts bring the claimant within our law, then he is entitled to its benefits, whatever may be his status elsewhere.''

Likewise the Appellate Court of Indiana in *Franklin* v. *Lee* (1901), *supra,* 30 Ind.App. 31 [62 N.E. 78], had before it a claimant asserting a right to inherit as a legitimate son of Daniel Lee, deceased. The proof showed that the claimant was begotten and born in Kentucky, out of wedlock, the natural child of Daniel Lee and Mary Cobb; that subsequent to his birth his parents intermarried in Kentucky. The weight of the holding is diminished by the fact that apparently the laws of Kentucky and Indiana were not substantially different in their pertinent aspects, but the court asserted (at p. 82 of 62 N.E.) : ''The Indiana statute is as follows : 'If a man shall marry the mother of an illegitimate child and acknowledges it as his own, such child shall be legitimate.' As to the right of appellee to inherit from Daniel Lee, the statutes in this state will govern, for it is a statute of descent.''

▮ It is obvious that the question with which we are dealing is one of comity, and is not controlled by the constitutional provision as to ''full faith and credit.'' Thus, in *Olmsted* v. *Olmsted* (1910), 216 U.S. 386, 395 [30 S.Ct. 292, 54 L.Ed. 530, 25 L.R.A.N.S. 1292], the United States Supreme Court held that (as well epitomized in the annotation at p. 942 of 73 A.L.R.) ''the courts of one state are not required by the full faith and credit clause of the federal Constitution to give effect to the statute of another state legitimizing children born prior to the marriage of their parents, so as to control the devolution under a will of the title to lands in the state, particularly where to give effect to such statute would disturb interests already vested when the statute was enacted.'' Of course it is obvious that if a state is not bound to recognize a status of legitimacy created in another state it is not obligated to leave unchanged a status of illegitimacy existing in such other state.

▮ We deem it uncontestable that each state may formulate its own public policy in respect to legitimation and can

enact laws to carry out its policy. There is no federal constitutional proscription against a state's adopting legislation which makes legitimate within the operation of its laws children who are illegitimate in other jurisdictions nor is there any constitutional requirement that such laws be limited in their applicability to children who were born in the state or whose parents (either or both) were domiciled in the state at the time of their birth or that such laws be dependent for operation on acts occurring within the state.

In the annotation at page 666 of Lawyers Reports Annotated 1916E the conclusion is stated that "Whether acts of recognition in a different jurisdiction will be effective seems to depend upon the requirements of the particular statute of the jurisdiction where the suit involving the question of recognition occurs."

It will be noted that in none of the legitimation provisions of the California law hereinabove quoted is there any express or apparent requirement that the precedent marriage, void or otherwise, has been solemnized in California; or that the child of the marriage, void or otherwise, has been born in California; or that the parents, or either of them, or the child, at any time have been domiciled in California; or that the subsequent marriage of the parents of an illegitimate child be contracted in California; or that the legitimating acts specified in section 230, occur in California.

We come thus to the question as to what is the proper construction and application to be given section 230 of our Civil Code. That question is not an open one. In the case of *Wolf* v. *Gall* (1916), *supra*, 32 Cal.App. 286, the District Court of Appeal was dealing with the same problem which now confronts us. The material facts and the ruling of the court (hearing in this court denied) may be shown by quotation. "Arturo Wolf and Maria Julia Wolf, the respondents in this case, are the children born out of wedlock of Newman Wolf and Carmen Gonzales, and seek to have awarded to them a share in the property described in the complaint as heirs at law of Tobe Funkenstein, deceased, their grandmother, by right of representation of their deceased father, it being the claim of respondents that the subsequent marriage of their parents legitimated them by virtue of the provisions of section 215 of the Civil Code, and that their adoption by their father into his family in connection with such marriage also had for

its effect their legitimation under section 230 of the same code. The court . . . decreed that the respondents are heirs at law of said Tobe Funkenstein, and entitled to succeed to a part of her estate. . . .'' The evidence established that the father, Newman Wolf, through whom descent was claimed, had at all times concerned been an alien domiciled in Guatemala, and that it was in Guatemala that the legitimating acts occurred. After disposing of various other contentions of appellants therein, the court proceeded: ''Nor do we think that the fact that Wolf was an alien and domiciled outside of California renders ineffectual the acts claimed to result in the legitimation of respondents. While it is generally true that the laws of one state or country have no extraterritorial effect, on the other hand, when the status of a person is under consideration before the courts of this state in questions of succession, they will apply our own statutes in determining the status of the claimant to the succession; and if the claimant shows that by applying our law he is entitled to take as a legitimate child, it is sufficient, and the fact that by the law of his own country he is not legitimate is immaterial.'' (Pp. 288-289 of 32 Cal.App.) It will be noted that in the above quoted case the children claimed by virtue of the provisions of both section 215 and section 230 of the Civil Code. The decision held both grounds to be good.

It has been suggested that a subsequent marriage (Civ. Code, § 215) may be differentiated from the legitimating acts contemplated by section 230 because such subsequent marriage changes the status of the parents. But this is patently a false differentiation because, unless the law of the place where such subsequent marriage occurs, or where the father is domiciled, ordains legitimation as a result thereof, such subsequent marriage in the other jurisdiction does not at all affect the legal status of the children in that jurisdiction. It affects only the status of the parents in their relationship *to each other,* not at all their status, in that jurisdiction, in relation to their illegitimate children. The decision in the Wolf case is based on the assumption that the children were still as illegitimate in the foreign state as though the marriage had not occurred. Such marriage was regarded simply as a fact—an act of the parents—which the law of California (Civ. Code, § 215) declares shall work in California the legitimation of the child. Section 230, likewise,

and with no more limitation as to the place of occurrence, declares that the acts of the father there specified shall accomplish the same result in respect to legitimating the child in its relationship to its father. It is apparent, therefore, that both grounds of the decision in the Wolf case support our conclusion here.

 Respondent impliedly seeks to have us overrule the Wolf case, although it is not cited in the briefs of either party, and necessarily asks us to apply a strict construction to section 230. It is suggested that section 230 is in derogation of the common law and should therefore be narrowly interpreted and applied. But such is not the proper rule of construction. The Civil Code itself declares the applicable rule (§ 4): ''(The rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to this code. The code establishes the law of this state respecting the subjects to which it relates, and its provisions are to be liberally construed with a view to effect its objects and to promote justice.'' We are satisfied that section 230 was properly construed and applied in the Wolf case. Such case is not the only instance in which that section has had liberal construction and application.

In *Blythe* v. *Ayres* (1892), 96 Cal. 532 [31 P. 915, 19 L.R.A. 40], we find an exhaustive and scholarly opinion* by Mr. Justice Garoutte in which, among other things, the objects and purposes of section 230 are admirably enunciated. He said (pp. 559-560 of 96 Cal.): ''The section is broad in its terms. It contains no limitations or conditions, and to the extent of the power vested in the legislature of the state, applies to all illegitimates, wherever located and wherever born. The legislature has not seen fit to make any exception to its operation, and as was said by Taney, C.J., in *Brewer* v. *Blougher*, 14 Pet. 178 [10 L.Ed. 408], when considering a quite similar provision of a statute: 'In the case before us, the words are general, and include all persons who come within the description of illegitimate children, . . . and when the legislature speaks in general terms of children of that description without making any exceptions, we are bound to suppose they design to include the whole class.'

---

*Justices Paterson and Sharpstein fully concurred with Justice Garoutte in the main opinion. Two justices concurred in the judgment on one of the two theories stated in that opinion but dissented from application of the other theory solely on factual grounds which are not material under the facts of the case at bar.

"Bar, in his work on International Law (p. 434), says: 'Legitimation of bastards, either by subsequent marriage or by an act of the government (*Rescriptum principis*), is nothing but a legal equalization of certain children illegitimately begotten with legitimate children.' In other words, the object and effect of section 230 is to change the *status* and capacity of an illegitimate child to the *status* and capacity of a child born in lawful wedlock."

The learned Justice then concisely depicts the essential facts of the case and proceeds to a discussion of the extraterritorial aspects of operation of the law (pp. 560-561 of 96 Cal.) : "We have here a father at all times domiciled in the state of California, a mother at all times domiciled in England, and an illegitimate child born in England, and continuously there residing until the death of her father in California. . . . The contention of appellants that the *status* of a person residing in a foreign country and a subject thereof cannot be changed by acts performed in California, under a provision of the law of our state legislature, cannot be supported as a rule without many exceptions, and to the extent of those exceptions, a state law must be held, by its own courts at least, to have extraterritorial operation. . . . The doctrine of extraterritorial operation of state laws is fully exemplified in the case of *Hoyt* v. *Thompson,* 5 N.Y. [320] 340, where the court says: 'It is a conceded principle, that the laws of a state have no force, *proprio vigore,* beyond its territorial limits, but the laws of one state are frequently permitted by the courtesy of another to operate in the latter for the promotion of justice, where neither that state nor its citizens will suffer any inconvenience from the application of the foreign law. This courtesy, or comity, is established, not only from motives of respect for the laws and institutions of the foreign countries, but from considerations of mutual utility and advantage.' "

Again, in *Osborn* v. *Ozlin* (1940), 310 U.S. 53, 62 [60 S.Ct. 758, 761, 84 L.Ed. 1074], the Supreme Court stated that "The mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within that domain which the Constitution forbids." (See, also, *State Farm Mut. Automobile Ins. Co.* v. *Duel* (1945), —— U.S. —— [65 S.Ct. 573, 575, 89 L.Ed. ——].)

Discussing section 215 of the Civil Code ("A child born before wedlock becomes legitimate by the subsequent mar-

490

riage of its parents") Justice Garoutte says (pp. 563-575 of 96 Cal.): "This section takes a wide range; its operation is not confined within state lines; it is as general as language can make it; oceans furnish no obstruction to the effect of its wise and beneficient provisions; it is manna to the bastards of the world. If Blythe [plaintiff's father], subsequent to the birth of plaintiff, had returned to England and married Julia Perry [plaintiff's mother], such marriage, under the provision of law just quoted, *ipso facto,* would have resulted in the legitimation of Florence Blythe. Then, . . . we say that she was so domiciled that by the laws of California she could have been changed from bastardy to legitimacy. . . .

"[P. 567] We have in *Loring* v. *Thorndike,* 5 Allen, 257, a case involving additional elements, and therefore additional complications, even to those found in the Munro case [*Munro* v. *Munro,* 1 Rob. App. 492, discussed on pp. 564-566]. The man was domiciled in Massachusetts. The woman was domiciled in Mayence. The illegitimate children were born in Frankfort-on-the-Main, and the marriage occurred at that city. To accomplish legitimation, the Massachusetts law required not only a subsequent marriage, but a subsequent acknowledgment of the child. Upon this state of facts, and this provision of law, the child was held legitimate by the Massachusetts court, *even though the acts of acknowledgment occurred in a foreign country.* [Italics added.] . . . [P. 571] We have quoted thus extensively from the authorities upon the subject of domicile as specially bearing upon the question of *legitimatii per subsequens matrimonium,* for the reason that we are unable to perceive any difference in the general principles of law bearing upon that character of legitimation and in those principles bearing upon other forms of legitimation authorized by the same statute. . . . [P. 572] Upon principle, no distinction can be made between the rules of law applicable to these various forms of legitimation. . . . [P. 575] Legitimation is the creature of legislation. Its existence is solely dependent upon the law and policy of each particular sovereignty. The law and policy of this state authorize and encourage it, and there is no principle upon which California law and policy, when invoked in California courts, shall be made to surrender to the antagonistic law and policy of Great Britain." And likewise, we may paraphrase, there is no principle upon which our law and policy, now invoked, shall be

made to surrender to the antagonistic (if they be such) law and policy of Minnesota or New Mexico or Norway.

It is thus apparent that the failure of the proof to expressly establish that petitioner himself became domiciled in California during his father's lifetime (assuming that because he was of adult years his domicile did not follow that established by his father) does not defeat his claim. We are also satisfied that the broad and sweeping language of section 230, considered in the light of the public policy evidenced thereby, does not contemplate that the operation of that section shall be limited by judicial construction to the legitimation of those children only whose respective fathers were domiciled in California at the time of their birth. No sound basis for any such classification among illegitimates appears and to indulge it would not only write into the statute a limitation not placed there by the Legislature but would defeat in many cases the policy which dictated the legislation.

We likewise are satisfied that it would be contrary to the purpose of the statute and the public policy of this state, and an unwarranted restriction upon the language used, to interpret it as applying only to *minor* children. Certainly an adult is as interested as is a minor in transmutation of status from illegitimacy to legitimacy and we perceive no compelling reason why the policy of the state favoring legitimation of children should be cut off upon their attaining majority. In *Estate of Pico* (1877), 52 Cal. 84, this court in a per curiam opinion held that section 230 was applicable only to minor children. Its conclusion was based on the proposition that section 230 appears in the chapter headed "Children by Adoption" and that the first section in that chapter (§ 221) provides that "Any minor child may be adopted by any adult person, in the cases and subject to the rules prescribed in this chapter." Then follow several sections which unquestionably do apply exclusively to minor children. But section 230, after providing that "The father of an illegitimate child, by publicly acknowledging it as his own [etc.] . . . thereby adopts it as such," concludes with the sentence, "The foregoing provisions of this chapter do not apply to such an adoption." We think it reasonable, therefore, and more consonant with our view of the state's policy, to construe the statute as it stands enacted, neither adding to nor subtracting from its

words, and to hold that its benefits are available to all so-called illegitimate children (who in truth could be more accurately referred to as the natural children of illegitimate parents) whether they be minors or adults and whether the acts essential to effectuate their legitimation occur during their minority or later. "When a statute . . . is equally susceptible of two interpretations, one in favor of natural right, and the other against it, the former is to be adopted." (Code Civ. Proc., § 1866.)

It is also to be observed, as strengthening our conclusion in respect to differentiating the applicability of section 230 from that of other sections in chapter II of title II, part III, division I of the Civil Code, that there is a natural and basic difference between the adoption of blood strangers and the adoption by legitimation of a natural child. Concerning this difference, Justice Garoutte in *Blythe* v. *Ayres* (1892), *supra,* 96 Cal. 532, 559, said: "Before passing to the merits of the discussion, we pause a moment to say that the verb 'adopts,' as used in section 230, is used in the sense of 'legitimates,' and that the acts of the father of an illegitimate child, if filling the measure required by that statute, would result, strictly speaking, in the legitimation of such child, rather than in its adoption. Adoption, properly considered, refers to persons who are strangers in blood; legitimation, to persons where the blood relation exists. (See law dictionaries,— Bouvier's, Black's, Anderson's, and Rapalje's.) This is the distinguishing feature between adoption and legitimation, as recognized by all the standard law-writers of the day who have written upon the subject; and for the reason that the text-writers and decisions of courts, to which we shall look for light and counsel, treat the subject as a question of legitimation, we shall view the matter from that stand-point." Webster's New International Dictionary, second edition, says "legitimate" means "To put [a bastard] in the position or state of a legitimate child before the law, by legal means;— distinguished from *adopt,* which has no reference to blood relation." (See, also, *Estate of McNamara* (1919), 181 Cal. 82, 86 [183 P. 552, 7 A.L.R. 313].)

So considered, it becomes the more obvious that it is reasonable to conclude that the Legislature by declaring in section 230 that "The foregoing provisions of this chapter do

not apply to such an adoption," i. e., to *legitimation,* meant to confer the broad benefits of that procedure without the limitations express or implicit in ordinary adoption proceedings. *Estate of Pico* (1877), *supra,* 52 Cal. 84, to the contrary (and which is in effect and on reason inconsistent with *Wolf* v. *Gall* (1916), *supra,* 32 Cal.App. 286, 295-296), is overruled; dicta, based on *Estate of Pico,* appearing in *In re Jessup* (1889), 81 Cal. 408, 421 [21 P. 976, 22 P. 742, 1028, 6 L.R.A. 594], and in *Estate of Heaton* (1902), 135 Cal. 385, 387 [67 P. 321], are disapproved.

Assuming, as we have held, that the provisions of section 230 are applicable to adult as well as minor children, it is not disputed that Andrew Lund, at least in the States of Minnesota and New Mexico, did everything necessary to have legitimated petitioner in California if the legitimation statutes of this state ever became operative upon the status of petitioner in relation to his father. Andrew publicly acknowledged petitioner as his own child; he received petitioner as such, with the consent of his wife, into his family, and he otherwise treated petitioner as if he were a legitimate child. He died leaving estate in California. Under the holding in the Wolf case this showing entitles petitioner to succeed, in the status of a legitimate son, to a share in the estate of his father. But it is not alone upon the authority or theory of the Wolf case that petitioner has established his status and right of succession.

When Andrew Lund came to California and made his domicile here the status of the relationship between Andrew and petitioner clearly then, if not before, became subject to the jurisdiction of this state for all purposes connected with the administration of its laws. Excluding for the purposes of this discussion (in order that we may fully examine the legal issues upon this theory) the effect and theory of the ruling in *Wolf* v. *Gall* (1916), *supra,* 32 Cal.App. 286, 288, the sole question not already disposed of is whether upon the facts shown the law of California ever became operative to work the transmutation of status.

Let us scrutinize carefully the requirements of our statute and measure them with the facts established. The first requisite is that the father shall *publicly* acknowledge the child as his own. This he did. The public acknowledgment

shown here was and *still remains* unconditional. It was not subjected to any limitation of time or territory; it was a *public* acknowledgment for all time to the whole world—to the citizens of California as well as to those of Minnesota. Andrew Lund sent to Norway for *his son Bert Lund*, not for a person designated as the illegitimate child of Caroline Anderson. It was Bert Lund, *the acknowledged son of Andrew*, who traversed the long route from Norway, on the high seas of the world, across the Atlantic Ocean, through half of the United States, to the family home in Minnesota. There, in compliance with the second requirement of the California statute, and further evidencing compliance with the first, Bert was received into the family with the full consent of both Andrew and his wife Agnes. From then on, conforming to the third specification of the statute, Bert was treated as if he were a legitimate child; in the language of the stipulated testimony, he "was treated by Andrew and Agnes Lund the same as they treated Frank and Blanche Lund."

Is it reasonable to hold that this public acknowledgment, this receipt into the father's family and treatment as a legitimate child, were all revoked and destroyed in their *factual* significance by a mere change of domicile? On the contrary, it seems more consonant with reason to hold that the unconditional public acknowledgment of a child as his own by a man who has full knowledge of all the facts, is, as previously suggested, not an act which is subject to limitations of time or territorial boundaries. Likewise it must be accepted as true that once a child has been received into the family of its father, *it attains the de facto status of a member of that family*, and unless disavowed, such status (in a broad sense) continues with it for the remainder of its days. The word "family" means not merely those who live in one house but, in equally wide usage, signifies all who are descended from a not too distant common progenitor. (Webster's New Int. Dict. (2d ed.)) Here the petitioner was received into the intimate family circle, the household itself; he became as much a member of the family as was his half-brother Frank or his half-sister Blanche. That de facto status of family relationship is affirmatively shown to have continued during all the years of the family's residence in Minnesota and in New Mexico. It is not shown to have ever been disavowed or

terminated. So firmly established, it became a continuing factual status, which was attached to and went with the family and each of its members. Its *legal* significance, or lack thereof, in Minnesota and New Mexico is not binding on California. It is its *factual* significance which is controlling. That factual significance was indelibly attached to Andrew Lund and came with him to California. Having so many years previously first publicly acknowledged petitioner as his son, and having thereafter consistently treated him in all respects as a legitimate child and member of his family, is it to be expected that Andrew, upon coming to California, should have told his new neighbors: "I have a son named Bert. He was born illegitimate in Norway but many years ago in Minnesota I publicly acknowledged him as my child; I received him, with the consent of my wife, into my family; he has resided with us since; I have treated him as my legitimate child and as I treat my son Frank and my daughter Blanche; we moved to New Mexico; I publicly acknowledged him there and he continued to reside with us," etc.? On the contrary would it not be more consistent with treating petitioner in every respect as a legitimate child, and with continuing reaffirmation of all the acts of the father in Minnesota and New Mexico, for Andrew to remain silent on such intimate events of the past? Silence, it is said, when one is under a duty to speak, may be more eloquent than words; and silence by a father as to the legitimacy of a child, once that child has been publicly acknowledged and received into the father's family, is convincing evidence of continuation of the public acknowledgment, and in itself exemplifies treating the child as legitimate.

It is presumed "That a thing once proved to exist continues as long as is usual with things of that nature" (Code Civ. Proc., § 1963(32)) and "That a person is innocent of . . . wrong" (Code Civ. Proc., § 1963(1)). Hence it will be presumed that the publicly acknowledged and long established and recognized factual status of family relationship between father and son continued after Andrew moved to California and that he did not wrong his son by disavowing his theretofore long continued, consistent, and otherwise continuing public acknowledgment of the fact. Once the child had been unconditionally received into the family, he was received permanently and continuingly unless and until such reception

was revoked (if in its nature it could be revoked), and a revocation of such reception would constitute an unnatural and wrong act. Such an act will not be presumed. Bert Lund, the petitioner, no more lost his continuing status as a de facto member of the Lund family by the coming of Andrew to California than did Frank or Blanche lose their de jure status in that family.

We are satisfied that the public, unconditional, and long continued acknowledgment of a child by his father, with full knowledge of the facts, accompanied by reception of the child into the family and treatment as a legitimate child, constitutes a continuing representation to the whole world of a permanent de facto family status which is the very essence of the requirements of section 230 of our Civil Code; that such representation is of a fact which by its nature is inherently permanent and continuing and goes with the father wherever he goes. The factual significance of the father's acts, proclaimed to the whole world, was the same in California as in Minnesota or New Mexico. The fact that the legal effect of those acts may have been inconsequential in Minnesota and New Mexico is immaterial in California. When Andrew Lund came here and established his domicile he did so in the light of the factual significance of his previous acts. His conduct in California in remaining silent in respect to the facts surrounding the birth of petitioner is consistent with his prior acts and amounts to a continuing representation of the facts and de facto status which he had publicly proclaimed. His acts were, it is repeated, inherently of a permanent and continuing character. The biological relationship of father and son, and the de facto family relationship which the father had established, are not transient or volatile things which may exist one moment and be nonexistent the next, or which depend for their continuance upon repetitions of the original words or acts. Once proclaimed and established they exist as facts for all time and in all places. And when the living proclaimer of those facts comes to California and establishes his domicile herein and leaves estate to be distributed according to our laws of succession, the courts of California need not ignore those facts and are not powerless to apply them. Their legal effect within this state will be admeasured by the laws of this state.

For the reasons hereinabove stated the order appealed from is reversed and the cause is remanded to the trial (probate) court with directions to enter its decree establishing the right of petitioner to share in the estate of his father as a legitimate son.

Gibson, C. J., Carter, J., and Peters, J. pro tem., concurred.

EDMONDS, J.—I cannot concur in the conclusions upon which this case is decided and am of the opinion that the judgment of the probate court should be affirmed. The petitioner had the burden of proof (Prob. Code, § 1230) ; presumably he made out as favorable a case as the facts would permit and all inferences to be drawn from the evidence must be resolved in favor of the order of the probate court. But Mr. Justice Schauer has weighed the evidence and drawn inferences from it contrary to those of the trier of facts to support a theory which he principally justifies upon grounds of social policy.

Section 230 of the Civil Code provides that a child is legitimated for all purposes when the father publicly acknowledges his parentage, receives the child into his family with the consent of his wife, if married, and otherwise treats the child as if it were legitimate. This section, Mr. Justice Schauer states in effect, should be construed as providing that, for the purpose of status in California, any child born out of wedlock may be legitimated by the declaration of the father without regard to the domicile of the parent at the time he acknowledges the relationship. Yet the statute includes no language which, by the broadest construction allowable under fundamental legal principles, properly may be held to give it unlimited extraterritorial effect in contravention of the established rules concerning conflict of laws.

Certainly, the enactment expresses no intention that its operation shall violate the doctrine by which, in general, status is determinable according to domiciliary law (Beale, Conflict of Laws (1935), vol. 1, § 1.8, p. 7; § 9.3, p. 91; Goodrich, Conflict of Laws (2d ed. 1938), pp. 25, 26; Stumberg, Conflict of Laws (1937), p. 254). The narrow question for decision, therefore, is whether, for the purpose of fixing the petitioner's status, a statute of this state which allows status to be established by the acknowledgment of a father, governs a declara-

tion made by one then a resident of a foreign jurisdiction.

"The rules of Conflict of Laws are part of the law of each common law state, and as such are as binding upon the courts as any other parts of the law of the state." (Rest., Conflict of Laws, § 5, p. 9.) And, it is stated in the comment to the foregoing section, "Conflict of Laws, as adopted, becomes no less definitely a part of the law than any other branch of the state's law; and in the application of its principles the courts have no more discretion than in any other part of the law. . . . It derives this law from the same sources used for determining all its law: from precedent, from analogy, from legal reason, and from the consideration of ethical and social need. . . . Upon careful analysis, the application of the principles of Conflict of Laws does not impair in the least the sovereignty of the state applying the rule of another state to a legal problem. . . . Principles of Conflict of Laws are 'law' in the true sense and involve no departure from the theory that territorial law is supreme." (Goodrich, Conflict of Laws (2d ed. 1938), pp. 9-11; and see, also, Beale, Conflict of Laws (1935), vol. 1, § 5.3, p. 52.)

The evidence in the present case shows, without contradiction, that although the father acknowledged parentage and took his son into his home while domiciled in Minnesota and New Mexico, he made no legitimating declaration while domiciled in this state, nor did the boy live with him here. Under these circumstances, as I read the law, there is no "wide and heterogeneous conflict in authority" as Mr. Justice Schauer asserts. "Where some act other than the subsequent intermarriage of the parents is relied on to establish legitimacy—as, for instance, acknowledgment of paternity—," a late text declares, "the general rule is that the law of the father's domicil at the time of the legitimating act will be the proper law to determine the status of both parent and child. The father must, at the time of the acts of legitimation, be domiciled in a jurisdiction wherein those acts are recognized as legally sufficient. They will not, on his subsequently becoming domiciled in a jurisdiction in which they are sufficient, be permitted to operate nunc pro tunc as a legitimation in the latter jurisdiction." (11 Am.Jur. [Conflict of Laws, § 21] 319.) The same rule is stated in the Restatement, Conflict of Laws, section 140, page 207, as follows: "An act done after the birth of an illegitimate child will legitimize the child as to a parent

from the time of the act if the law of the state of domicil of that parent at that time so provides. . . . The law must be that of the state in which the parent is domiciled at the time of the act; it is not enough that he later becomes domiciled in a state whose law provides for the legitimizing upon the doing of the act.''

California has been uniformly included in the states which follow the general rule and *Blythe* v. *Ayres*, 96 Cal. 532 [31 P. 915, 19 L.R.A. 40], is widely cited by practically all of the leading authors and encyclopedias as well as by the courts of the sister states as a leading case in support of the doctrine. Blythe, while domiciled in this state, publicly acknowledged the plaintiff as his child and the court held that the declaration effected legitimation. But as the plaintiff resided in England until the time of Blythe's death, the statements of the court regarding the extraterritorial operation of the statute were in regard to that circumstance; they are not authority for holding that the declarations made by a father while domiciled outside of this state satisfy the provisions of section 230 of the Civil Code.

When facts similar to those shown in the present case were before the Supreme Court of Oklahoma, upon the authority of *Blythe* v. *Ayres, supra,* which was said to be in accord with the general rule that the domicile of the father is controlling, it was held that the child was not legitimated by a statute identical with section 230 of the Civil Code of this state. The court said: ''We are of the opinion that the particular rule applicable to this case and the rule that seems to be sustained by the greater weight of authority is found in 5 R.C.L., sec. 15, p. 920, which is as follows: 'Where some act other than the subsequent intermarriage of the parents is relied on to establish legitimacy, as, for instance, acknowledgment of paternity, the general rule is that the law of the father's domicile at the time of the legitimating act will be the proper law to determine the status of both parent and child. . . .' '' (*In re Presley's Estate,* 113 Okla. 160 [240 P. 89].)

The case of *Pfeifer* v. *Wright,* 41 F.2d 464 [73 A.L.R. 932], extensively quoted from by Mr. Justice Schauer, is to the same effect. There the minor was born in Kansas where her mother and father then resided, and was always there acknowledged

as the child of the parties. The father died a resident of Oklahoma, leaving property in that state. The court recognized the rule that the domicile of the father at the time of his acts of acknowledgment governed the status of the child, but held that the Kansas statute was merely a statute conferring rights of inheritance, rather than a statute changing status. The American Law Reports annotation to this case (73 A.L.R. 941) is enlightening. In discussing the question as to which state shall furnish the law to determine legitimacy, it states: "As a general rule, where the ground for the acquisition of the status of legitimacy is an act other than the intermarriage of the parents, such as the act of the father in acknowledging the child as his own, the question whether such act will have the effect of legitimating the child will be determined by the law of the domicil of the father at the time of the performance of the act, to the exclusion of any other law. . . . Neither the law of the state of the mother's domicil, nor that of the state of the child's birth, nor that of the state of the actual residence of the child, will be applied in determining whether the acts relied upon as having a legitimating effect have that effect; but the applicable law is that of the domicil of the father at the time he acts. . . ." (Pp. 956-957.)

Again in 10 Corpus Juris Secundum 51, it is stated: "In general, the domicil of the father of an illegitimate child determines as to subsequent legitimation, as, for example . . . by acknowledgment or recognition, or by public acknowledgment, together with other acts, by the father which are required by the applicable statute, and the laws of the domicile of the child and mother are not controlling with reference to alleged acts of legitimation by the father."

Notwithstanding this overwhelming authority, and the decision in the Blythe case, Mr. Justice Schauer states that the construction and application of section 230 of the Civil Code is not an "open" question in California. This declaration is based upon the decision in *Wolf* v. *Gall*, 32 Cal.App. 286 [163 P. 346, 350]. Although the District Court of Appeal erroneously interpreted the Blythe case as holding that a legitimation occurs when a child is acknowledged by his father at a time when the father was domiciled without this state (California Annotations, Rest., Conflict of Laws, p. 64),

in denying a hearing this court stated that "we are not entirely in accord with all the reasoning" of the opinion. Also, it should be noted, the decision in the District Court of Appeal was placed upon the alternative grounds that the Wolf children were legitimated according to both sections 215 and 230 of the Civil Code, and in refusing to hear the case, this court held that the children were entitled to inherit as illegitimates under Civil Code, section 1387 (now Prob. Code, § 255). The opinion of this court strongly implies that it agreed with the conclusion of the District Court of Appeal only because the children were entitled to inherit according to the terms of the section governing the rights to succession of children born out of wedlock. Accordingly, regardless of the decision in *Blythe* v. *Ayres, supra,* the Wolf case is, at most, doubtful authority.

It is significant that the courts of other states have recognized and followed *Blythe* v. *Ayres, supra,* as stating the law of California, mentioning the Wolf case as being contrary to the earlier decision. "As to the case of *Wolf* v. *Gall,*" said the Supreme Court of Nevada, ". . . we have never attached any weight to it, so far as the question in this case is concerned; for, no matter what significance might be given it under ordinary circumstances, the Supreme Court of California . . . held that it was not entirely in accord with its reasoning. In any event . . . so far as we are advised, the law as laid down in the Blythe case is still good in California . . . [and the Blythe] opinion turned upon the proposition that the law of the domicile of the father controlled, a rule which we know to be supported by practically all of the authorities in the United States, and as well, we believe, by sound reason." (*In re Forney's Estate,* 43 Nev. 227 [184 P. 206, 186 P. 678, 24 A.L.R. 553].) Also, in the case of *In re Presley's Estate, supra,* wherein the Oklahoma Supreme Court held that a statute identical to section 230 did not govern status under circumstances the same as those in the present case, the court construed the holding in *Blythe* v. *Ayres* as in accord with the general rule that the law of the domicile of the father was controlling and disposed of *Wolf* v. *Gall* with the comment: ". . . Yet we do not think, under the state of facts of that case, so different to the one under

consideration here, that it can be given very serious weight here, and certainly it cannot be controlling in this case.''

To supply the obvious deficiency of legal authority to support his conclusions, Mr. Justice Schauer relies upon theories having no support in law. For example, as a final ground of decision, he attempts to ignore the fact that the father of Lund made no legitimating declaration while domiciled in this state by holding that the acts done in Minnesota and New Mexico, as a matter of law, were repeated wherever the father went and must be presumed to have continued at all times unless expressly revoked. The authorities clearly refute any such artificial and unwarranted presumption; they squarely hold that it is not sufficient that the father later acquires a domicile in a state recognizing the acts as conferring legitimacy.

As justifying the departure from established legal principles, Mr. Justice Schauer also mentions the present day change of attitude toward those born outside of the marriage relation, and concludes that any divergence of opinion, as evidenced by the present controversy, reflects ''the personal attitudes of the justices of the various courts as being conservative or liberal in the interpretation and application'' of legitimation statutes. But neither sentiment nor the desire to reach a particular result is a sound basis for evading or overturning long accepted rules of decision and only by judicial legislation may it be said that the law of California affords any relief upon the facts shown by the record in the present case.

The question before the court is not whether the statute should be liberally construed for the purpose of determining whether the father performed the acts required by law; the issue is one of private international law. The necessity for and the purpose of rules of conflict of laws is at once apparent to anyone who contemplates upon the difficulties arising from the fact that this nation is comprised of forty-eight different states each having its own body of law. Otherwise, those whose affairs transcend a single state's boundaries would be without guidance as to the law governing their acts. (See Beale, Conflict of Laws (1935), vol. 1, § 1.3, p. 4; Goodrich, Conflict of Laws (2d ed. 1938), pp. 4-6.) As stated in the Introduction to the Restatement of the Law, Conflict of Laws (pp. xiii and xiv) : ''The subject has presented very great

special difficulties. Extraordinary as it may appear in view of the fact that we are a nation of forty-eight states, each with its own body of law, these special difficulties are in the main due to the fact that the legal profession has failed until recently to recognize the great practical importance of the subject. . . . Due to this pedagogical neglect the courts, confronted with questions of Conflict of Laws, have not, in many cases, brought to their solution an adequate background of knowledge."

For these reasons, in my opinion, the judgment should be affirmed.

Shenk, J., and Traynor, J., concurred.