RHODE ISLAND HOSPITAL TRUST COMPANY, *Trustee vs.* FRANK S. HOPKINS *et al.*

JUNE 30, 1961.

PRESENT: Condon, C. J., Roberts, Paolino, Powers and Frost, JJ.

FROST, J. This is an amended bill of complaint brought by Rhode Island Hospital Trust Company as trustee under the will of Lyman R. Hopkins, late of the city of Cranston, deceased, against his various descendants for the construction of a certain portion of said will and instructions to such trustee. Answers were filed and evidence taken in the superior court and thereafter the cause being ready for hearing for final decree, a decree was entered under G. L. 1956,

§9-24-28, certifying the cause to this court for our determination.

The trustee seeks construction of the first half of the fifteenth clause of the will, which portion reads as follows:

> *"Fifteenth.* The trust sum of Seventy-five Thousand Dollars to my son George L. Hopkins, of Twelve Thousand Five Hundred Dollars to my grandson George S. Hopkins, of Twenty-Five Thousand Dollars to my granddaughter Gertrude L. Hopkins, and of One Hundred Thousand Dollars to my wife Rosalie M. Hopkins shall continue in trust until the decease of all, as one dies his or her interest shall go to the survivors share and share alike, when the last shall die this trust fund aggregating Two Hundred Twelve Thousand Five Hundred Dollars shall be divided equally *per capita* among all my living lineal heirs."

The specific questions to which the trustee desires answers are the following:

> "First: Is the class now entitled to distribution to be determined as of the date of the decedent's death or as of the date of death of the last surviving life beneficiary, Gertrude L. Hopkins?

> "Second: Are issue of living descendants of the testator precluded from sharing in the distribution, and if not, who are so entitled and in what proportions?

> "Third: Whether the respondents, Frank S. Hopkins, George W. Hopkins, Joseph D. Hopkins and Charles L. Hopkins and their respective issue, or any of them, are entitled to share in the distribution, and if so, which of them and in what proportions?

> "Fourth: To what persons and estates and in what proportions is the trust principal now distributable by the trustee?"

On June 30, 1910 Lyman R. Hopkins executed the will which is the subject of this suit. He died on April 26, 1913 in his ninetieth year. For some years he lived in Brooklyn, New York.

By his first wife he had two children: Mary Hopkins who married one Drew and died prior to her father, and a son George L. Hopkins. Lyman R. Hopkins' second wife was

Rosalie M. Hopkins. The testator's daughter, Mary Hopkins Drew, had a daughter Elsie who married Benjamin T. Peck.

The testator's son's first wife was Annie or Anna or Minnie Hopkins to whom were born two children, George S. and Gertrude L. Hopkins. About 1890 George L. Hopkins left his wife and went to Fall River, Massachusetts, where he met Mary F. Sullivan. Upon his promise to marry her, she cohabited with him and by him had four sons, Frank S., Charles L., George W., and Joseph D. Hopkins, all prior to the year 1905. George L. Hopkins recognized the four boys as his children.

In 1905 George L. Hopkins and Mary F. Sullivan entered into a marriage contract with due legal ceremony in Massachusetts. At that time Mary did not know that the man she had married then had a wife and two children living in New York but she learned of this in 1907. In 1930 George L. and Mary Hopkins heard of the death of George L. Hopkins' first wife.

George S. Hopkins, the son of George L. by his first wife, had two sons, David and Lyman R. Hopkins II, who in 1910 were thirteen and eleven years old respectively.

In attempting to answer the first question it may be said of any word or phrase in a will the meaning of which is in doubt that the intention of the testator should be sought. Such intention should be sought in the language of the will itself and if not found there, then in circumstances outside of the will.

In *Rhode Island Hospital Trust Co.* v. *Beckford*, 67 R. I. 492, the court said at page 499:

> "The fundamental rule in the construction of a will is to determine the intention of the testator as expressed in the particular will under consideration and to give effect to that intention, if not in violation of law. As *Story, J.* said in *Sisson* v. *Seabury*, 1 Sumn. Rep. 235 at page 239, 'the intention of the testator is the pole star to guide and govern the Court.' This

principle needs no further citation of authorities for it has been repeatedly stated and applied in our decisions."

In *Starrett* v. *Botsford,* 64 R. I. 1, it is stated at page 6:

"Whether a testamentary gift vests in interest immediately on the death of the testator depends on the intention of the testator. This intention, however, 'is the intention testamentarily expressed; and when the testator uses familiar legal words, he must be presumed to have used them in their ordinary meaning, until the contrary *clearly* appears.' (italics ours) *Kenyon, Petitioner,* 17 R. I. 149, 154, 163."

The question then is as to the testator's intention in using the words in the fifteenth clause of his will, "when the last shall die this trust fund aggregating Two Hundred Twelve Thousand Five Hundred Dollars shall be divided equally *per capita* among all my living lineal heirs." Were the gifts of which the aggregate was $212,500 to vest upon the death of the testator notwithstanding distribution might be delayed many years, or were they to vest upon the death of the survivor of the beneficiaries of the four trust funds? In the latter event the vesting and the distribution would take place at practically the same time. There is no question that the law favors the early vesting of such gifts.

In *Dorrance* v. *Greene,* 41 R. I. 444, at page 451, the court stated:

"Under the well established rules of construction the word 'heirs' is held to refer to the living person or persons holding that relation at the time of the testator's death in the absence of an intention to the contrary clearly evidenced in the will itself."

And in *Starrett* v. *Botsford, supra,* the court said at page 6:

"An heir is one on whom the local law of descent casts the inheritance on the ancestor's death; and, where a testator uses that word in his will, it is presumed, in the absence of a *clearly* indicated contrary

intent in the will, that he used it in that sense. *Goodgeon* v. *Stuart,* 50 R. I. 6."

The rule of early vesting must, however, yield to the intention of the testator if such intention is reasonably shown. *DeWolf* v. *Middleton,* 18 R. I. 810.

In *Industrial Trust Co.* v. *Hall,* 66 R. I. 201, the court said at page 210: "We are not unmindful that the law generally favors the vesting of estates or interests, but such rule is not applicable, in our opinion, where a contrary intention is expressed in the will."

Had the testator died at the moment of the execution of his will he would have left two heirs and next of kin, namely, his granddaughter Elsie G. Peck and his son George L. Hopkins. The testator provided in the fourth clause of his will for the immediate payment to his granddaughter Elsie the sum of $5,000 and the annual sum of $3,000, and under the fifteenth clause Elsie was to receive 50 per cent of the residue of the estate when the youngest living lineal heir born during the lifetime of the testator should reach the age of twenty-five years.

In the seventh clause of his will the testator provided for the immediate payment of $2,000 to his son George L. Hopkins, and also the income from a trust fund of $75,000 amounting to $3,000 annually. It would seem that careful provision was made for the two persons nearest to the testator, legally speaking, such provision to take effect almost immediately after his decease.

Having in mind the consideration given to these two persons the testator in the fifteenth clause looked forward some years into the future, as well he might, since of the four beneficiaries two at least might reasonably be expected to live many years. The testator's grandson George S. Hopkins was approximately thirty-seven years of age at the time of the execution of the will and his granddaughter Gertrude L. Hopkins was only thirty-five years old at such time. Considering the ages of these two people the testa-

tor in 1910 might well believe that distribution of the trust funds would be delayed many years.

We are of the opinion, too, that the words, "shall be divided equally *per capita* among all my living lineal heirs," support the belief that the vesting was intended to be upon the death of the survivor of the four beneficiaries. Since in 1910 Lyman R. Hopkins was a man approximately eighty-six years of age and might fairly think that he would have two heirs at his death, it does not seem that he would use the words, *"per capita* among all my living lineal heirs." The words "among" and "all" are not appropriate words to use if a division was to be between two persons. It appears clear to us that the testator, having provided generously for those nearest him, was projecting himself into the future and making gifts to what might well be a considerable number whose names he could not be sure of knowing.

We are clearly of the opinion that the provisions of the will as a whole and the normal and usual meaning of the words just referred to reasonably show that the testator intended that the aggregate gift arising from the four trusts mentioned in the fifteenth clause should vest not on his death but rather upon the death of the survivor of the four beneficiaries, and we so answer the first question.

The second question is as to the issue of living descendants of the testator. Are they precluded from sharing in the distribution? It is our opinion that they are. Had the testator desired distribution among all his descendants he could easily have made that desire clear by using the words, all my descendants or all my issue living at the time of the decease of the survivor of the four named beneficiaries. He did not do that but used the word "heirs," which we think was used in the normal sense of that word. We see nothing in the will as a whole to indicate that the testator intended a distribution wider than the number of lineal

heirs living at the death of the survivor of the four beneficiaries.

The third question raises the right of the four sons of George L. Hopkins born to Mary F. Sullivan to share in the distribution. They were all living at the decease of the survivor, Gertrude L. Hopkins. These four sons were all illegitimate at the time of the execution of the testator's will on June 30, 1910. They were all born prior to the marriage of George L. Hopkins and Mary F. Sullivan in 1905. At this latter date Annie Hopkins, the wife of George L. Hopkins, was living and it was not until 1930 when she died that the said four boys born to Mary F. Sullivan became legitimated under a Massachusetts statute passed in 1895.

*Hopkins* v. *Hopkins*, 287 Mass. 542, were two companion cases. The first was brought in March 1933 in the probate court for the county of Bristol in the Commonwealth of Massachusetts by George W. Hopkins, administrator of the estate of his father George L. Hopkins, seeking a partial distribution of the estate, and the second was brought in May 1933 by Gertrude L. Hopkins and her brother George S. Hopkins for revocation of the appointment of the said administrator. A decree was entered in the probate court ordering a partial distribution among the widow and six children of the decedent and in the second case a decree was entered dismissing the petition. The probate judge found that the four children born in Massachusetts were legitimate and entitled to share in the estate of their father.

Appeals were taken from the decrees to the supreme judicial court where the opinion was written by Mr. Chief Justice Rugg who stated that the underlying question related to the matrimonial status of the intestate (George L. Hopkins) and Mary F. Sullivan and that "The determination of that question depends upon the interpretation of G. L. (Ter. Ed.) c. 207, §6 (identical with R. L. c. 151, §6, in force in 1905)." After considering at length the facts

connected with the lives of George L. Hopkins and Mary F. Sullivan, the court held at page 549: "We are of opinion that in all the circumstances the form of marriage of 1905 was validated after the death of the first wife in 1930."

As to the children, the court held at page 549:

"There is no description or limitation in G. L. (Ter. Ed.) c. 190, §7, as to the particular form of intermarriage by parents which shall have the effect of making a child legitimate who was born out of wedlock. Any intermarriage, which either immediately is, or remotely becomes, sanctioned by the law as valid, renders the child legitimate, if acknowledged by the father, from and after the time when the intermarriage becomes valid under the law. These children therefore are the legitimate children of the intestate and as such are entitled to share in his estate."

The Chief Justice did not go beyond saying that the sons were entitled to share in their father's estate since the answer to the problem before him did not require more. He did say, however, that the children were legitimate and that without qualification.

The two sections of the Massachusetts statutes relied on by the Chief Justice read as follows:

"If a person, during the lifetime of a husband or wife with whom the marriage is in force, enters into a subsequent marriage contract with due legal ceremony and the parties thereto live together thereafter as husband and wife, and such subsequent marriage contract was entered into by one of the parties in good faith, in the full belief that the former husband or wife was dead, that the former marriage had been annulled by a divorce, or without knowledge of such former marriage, they shall, after the impediment to their marriage has been removed by the death or divorce of the other party to the former marriage, if they continue to live together as husband and wife in good faith on the part of one of them, be held to have been legally married from and after the removal of such impediment, and the issue of such subsequent marriage shall be consid-

ered as the legitimate issue of both parents." G. L. (Ter. Ed.) chap. 207, §6.

"An illegitimate child whose parents have intermarried and whose father has acknowledged him as his child * * * shall be deemed legitimate * * *." G. L. (Ter. Ed.) chap. 190, §7.

Whether an illegitimate child who has been legitimated has become a legitimate child for all purposes depends upon the statute by which his status has been changed. We can find no language in these two Massachusetts statutes which limits or restricts the meaning of the word legitimate and causes it to mean something other than what it appears to be.

Some of the respondents have cited the case of *Hicks* v. *Smith,* 94 Ga. 809, decided in 1894. The court held in that case that a child who had become legitimate could take from his father but not from his father's grandfather, there being no language in the great-grandfather's will expressly indicating a purpose to include within the scheme of his benevolence any bastard descendants. The court held that the statute under which the illegitimate child in this case was made legitimate did not contain the words "fully legitimate" as found in an earlier statute and that there was nothing in the will justifying the inference that the great-grandfather intended to include the legitimated child as a legatee thereunder.

On the other hand a California court in construing a statute of the state gave full meaning to the word "legitimate." In *Wolf* v. *Gall,* 32 Cal. App. 286, it appeared that Arturo Wolf and Maria Julia Wolf both born out of wedlock sought to have a share in property as heirs at law of their deceased grandmother by right of representation of their deceased father, they claiming to have been legitimated by virtue of section 215 of the civil code. The superior court found in their favor. There was an appeal. The court in affirming the portion of the judgment appealed from said at page 290:

"We think it quite clear that compliance with the terms of either one of these sections makes a child born out of lawful wedlock legitimate; that, as stated in section 230, he is legitimate for all purposes, and that, as a legitimate child, his rights of inheritance are governed by section 1386 of the Civil Code, which confers rights of inheritance upon legitimate children."

*Smith* v. *Smith,* 105 Kan. 294, was a case brought for the partition of real estate and a question was whether the illegitimate son of Robert Smith was so recognized by his father as to be entitled to inherit from him. It was found that the paternity of the child was shown without question. On the question of the right to inherit, the court stated at page 300:

"The legislature contemplated a relationship of succession, not only with the father, but also with the heirs of the father. We have no doubt, from the language used, that the legislature intended to give an illegitimate child the status of a general heir in the matter of the descent and distribution of the property of an intestate, and that the plaintiff is entitled to inherit from his father's father."

It is seldom that two statutes are exactly alike and therefore each must usually be considered by itself. In the case of the Massachusetts statutes already referred to, we find no language that would permit us to say that the sons of George L. Hopkins who became legitimate under them in 1930 did not become legitimate in every sense of the word.

The respondents David Hopkins and Lyman R. Hopkins II argue strongly that the four sons of George L. Hopkins should not share in the distribution of the trust fund and rely not only upon the law but assert that the intention of the testator as evinced in the will is clearly against their sharing in it. We have read and considered with care the entire will and we fail to find on the part of the testator any expressions of a spirit of resentment toward his son or the latter's four sons.

It is to be noted that the name of the son's first wife is not mentioned in the will. Whether any significance is to be attached to this we cannot say but it is a fact that nothing was left to her through the will.

Reference has been made to the words "the four sons of my son." At the time of the execution of the will the four sons were illegitimate and the words in the will which were used were wholly accurate. In the sixth clause of the will the same method of reference is used in referring to David Hopkins and Lyman R. Hopkins II as "sons of my grandson George S. Hopkins" and "Benjamin T. Peck, Junior, son of my grand-daughter Elsie G. Peck." However, nowhere in the will does the testator speak unkindly of the said four sons or express the wish that none of his money should ever reach them. The testator at the time of the execution of his will was in his late eighties. He was a man of character, had mingled with men, and was aware that there are men of strong passions which are not always held in restraint. He undoubtedly felt keenly what his son had done but there is in the will or out of it no record of harshness toward his son or his son's sons. On the contrary, he provided a substantial trust fund for his son and made provisions for each of the four boys born of Mary F. Sullivan in the amount of $5,000 to be paid to each one when he had reached the age of twenty-five years. Considering the value of the dollar in 1910 a substantial gift was provided for each of the boys. We fail to find any expression in the will or indeed in any of the evidence placed before the court which indicates a feeling of hostility on the part of the testator toward these four sons of George L. Hopkins.

It is contended by some of the respondents that the sons of George L. Hopkins by his second wife are estopped from sharing in the trust fund by the judgment of a New York court in a proceeding brought by Elsie G. Peck, niece of George L. Hopkins, on June 5, 1931 to obtain partition of the testator's real estate in the borough of Brooklyn. While

in Massachusetts they were given notice of the proceedings in New York but did not appear in New York. Judgment went against them by default. They were held illegitimate and not entitled to share in the real estate as heirs of the testator. This was a proceeding in rem and was binding only upon the property and rights therein. The proceeding was brought after Rosalie Hopkins, wife of the testator, died in October 1929. As of that date the said four sons of George L. Hopkins were illegitimate and not heirs of the testator. Before a distribution of the money received from the sale of the real estate had been made George L. Hopkins had died, and in determining who were his heirs and next of kin the said four sons were found to be illegitimate notwithstanding under Massachusetts law they had become legitimate.

The judgment of the New York court relative to the Brooklyn real estate was res judicata as to the rights of the said four sons in that real estate but could have no effect upon their rights in 1959 in Rhode Island upon the fund left by their grandfather.

It appears from the transcript in the case at bar that some years ago a bill of complaint, Equity No. 6953, was brought by the trustee for a construction of some portion of this testator's same will. There was never any judicial determination of the questions raised therein and on December 8, 1925 it was marked "Discontinued." We have therefore given no consideration to that bill of complaint.

After a careful consideration of the language of the will and the transcript we find no evidence of animosity on the part of the testator toward the four sons of George L. Hopkins whose mother was Mary F. Hopkins. They were domiciled in Massachusetts and were found by the highest court in that state to have become legitimate sons of George L. Hopkins on the death of Annie Hopkins on July 30, 1930.

In accepting this decision of the state of their domicile which is the proper jurisdiction for the determination of

their status, *DeWolf* v. *Middleton, supra*, we find nothing in it unacceptable to the laws and decisions of the courts of this state.

In *Rhode Island Hospital Trust Co.* v. *Hodgkin*, 48 R. I. 459, which was a bill in equity for the construction of a will and involved the rights of an illegitimate child, the court said at page 464, speaking of the statutes relating to illegitimacy, "It may fairly be said, however, that by the weight of authority statutes of this nature are regarded as remedial." See also G. L. 1956, §§15-8-21 and 33-1-8; *Skeadas* v. *Sklaroff*, 84 R. I. 206.

Since the said four sons of George L. Hopkins were found to be legitimate by the highest court of their domicile, they were, on the death of Gertrude L. Hopkins on November 2, 1959, heirs of their father who deceased in December 1931. The word "legitimate" as used in the statute on which the Massachusetts decision was based was in no way limited or modified by language therein and we are therefore of the opinion that the said four sons were on November 2, 1959 lineal heirs of the testator and entitled to share in the distribution of the trust fund equally with one another.

Our answer to the fourth question is that the fund should be distributed to Frank S. Hopkins, Charles L. Hopkins, George W. Hopkins, Joseph D. Hopkins, sons of the late George L. Hopkins, David Hopkins, Lyman R. Hopkins II and Benjamin T. Peck, Jr. one seventh of the fund to each one.

On July 10, 1961, the parties may present to this court for approval a form of decree in accordance with this opinion to be entered in the superior court.

*Tillinghast, Collins & Tanner, Colin MacR. Makepeace,* for complainant.

*Swan, Keeney & Jenckes, H. William Radovsky,* Fall River, Mass., for respondent Frank S. Hopkins.

*Chace and Yatman, Elmer S. Chace, Goodman, Semon-off, Gorin and Blease, Ralph P. Semonoff,* for respondents Charles L. Hopkins et al., and respondent Joseph D. Hopkins, Guardian ad litem for Charles L. Hopkins III et al.

*Swan, Keeney & Jenckes, Harold S. R. Buffinton* (Fall River, Mass.), *Robert A. Bogle* (Fall River, Mass.), for respondents Charles L. Hopkins, George W. Hopkins, Joseph D. Hopkins.

*Elisha C. Mowry,* for respondents David Hopkins and Lyman R. Hopkins II.

*Sherwood and Clifford, Raymond E. Jordan, William A. Curran,* for respondents Elsie D. Pierce, Marilyn L. Jespersen, Joyia L. Hennessy, Benjamin T. Peck III; and for respondent Raymond E. Jordan, Guardian ad litem for Henry L. Jespersen IV et al.

*Charles H. Anderson,* for respondent George W. Hopkins, Administrator of Estate of George L. Hopkins.

*Hinckley, Allen, Salisbury & Parsons, Matthew W. Goring,* for respondent Benjamin T. Peck, Jr., individually and as ex'r u/w Elsie G. Peck.

*Levy, Carroll, Jacobs & Kelly, Arthur J. Levy, Lawrence S. Gates,* for respondent Frank H. Earll, executor u/w Gertrude L. Hopkins.