*In re* BLANCO ESTATE

BLANCO v BLANCO

Docket No. 52350. Submitted December 2, 1981, at Grand Rapids.—
Decided June 22, 1982.

Jose Roman Blanco, Sr., a Michigan resident, died intestate. In a
probate action, the Probate Court for the County of Allegan,
George A. Greig, J., found that two non-resident contested
heirs, the defendants herein, Maria Socorro Blanco (Socorro)
and Maria Santos de Esquilin), were daughters of Blanco, Sr.,
and also his heirs-at-law. A motion for reconsideration brought
by the administrator of the estate, who is also an uncontested
heir, was denied and incorporated in an order of denial. Jose R.
Blanco, Jr., an uncontested heir, appeals. *Held:*

1. The order determining heirs is a final order appealable as
of right to the Court of Appeals by the uncontested heirs-at-
law.

2. In determining heirs, the general rule is that the descent
and distribution of property is determined by the law of the
situs, actual, or constructive. The situs of the property invento-
ried in the Michigan probate is Michigan.

3. Michigan follows the minority rule which allows the law of
the situs of the property included in the probate estate to
control the question of whether a child is legitimate.

4. The law in Michigan is not now and never has been to

REFERENCES FOR POINTS IN HEADNOTES
[1] 4 Am Jur 2d, Appeal and Error § 206.
  23 Am Jur 2d, Descent and Distribution § 106.
[2] 23 Am Jur 2d, Descent and Distribution §§ 19, 20.
[3, 6] 10 Am Jur 2d, Bastards § 152.
[3] 23 Am Jur 2d, Descent and Distribution § 16.
[4, 7] 10 Am Jur 2d, Bastards §§ 154, 158.
[5] 23 Am Jur 2d, Descent and Distribution §§ 21, 22.
[6] Legitimation of marriage to natural father or child born during
  mother's marriage to another. 80 ALR3d 219.
[8] 10 Am Jur 2d, Bastards § 97.
[9] 10 Am Jur 2d, Bastards § 149.

treat legitimate and illegitimate children alike for the purpose of intestate succession.

5. Determinations of heirs are to be governed by statutes in effect at the time of death, therefore, the law applicable to this case allows an illegitimate child to inherit intestate from her father only if her parents married subsequent to her birth or if the parents acknowledged her as their child in writing and recorded the writing.

6. The law applicable to this case is not unconstitutional since there are legitimate state interests which can justify treating legitimate and illegitimate children differently for inheritance purposes.

7. There is no proof that Esquilin is a legitimate daughter of Blanco, Sr., or that Blanco, Sr., ever married Esquilin's mother or acknowledged her as his daughter. Therefore, she is not an heir-at-law of Blanco, Sr., and is not entitled to inherit from him.

8. There is no proof that Socorro is a legitimate daughter of Blanco, Sr., or that Blanco, Sr., ever married Socorro's mother or acknowledged her as his daughter. Therefore, she is not an heir-at-law of Blanco, Sr., and is not entitled to inherit from him.

9. Even if the Court of Appeals gives effect to a finding of a Puerto Rican court that Esquilin is the daughter of Blanco, Sr., as an illegitimate daughter, she is not entitled under Michigan law to inherit.

Reversed.

1. DESCENT AND DISTRIBUTION — APPEAL — PROBATE COURT — ORDERS — DETERMINATION OF HEIRS — COURT OF APPEALS.

An order of a probate court determining heirs is a final order appealable as of right to the Court of Appeals by the uncontested heirs-at-law (MCL 600.861; MSA 27A.861).

2. DESCENT AND DISTRIBUTION — DETERMINATION OF HEIRS — LAW OF SITUS.

The general rule, in determining heirs in a probate action, is that the descent and distribution of property is determined by the law of the situs, actual or constructive.

3. DESCENT AND DISTRIBUTION — QUESTIONS OF LEGITIMACY — LAW OF SITUS.

Michigan follows the minority rule which provides that the law of the situs of the property included in a probate estate controls

the question of whether a child is legitimate and, therefore, within the class entitled to inherit.

4. DESCENT AND DISTRIBUTION — INTESTATE SUCCESSION.

Michigan's law of intestate succession presently allows an illegitimate child to inherit from his mother as if he were legitimate, however, he can inherit from his father only if his father acknowledges him as his child in writing, or if the father joins with the mother in a written request for a birth certificate correction, or if the father and child have mutually acknowledged a parent and child relationship between each other beginning before the child turns 18 and continuing until either's death; in addition, he can inherit from his father if, in a paternity suit, it is determined that the intestate is his father (MCL 700.104, 700.111; MSA 27.5104, 27.5111).

5. DESCENT AND DISTRIBUTION — DETERMINATION OF HEIRS — TIME OF DEATH.

The determination of heirs, in a probate action, is governed by the statutes in effect at the time of death.

6. DESCENT AND DISTRIBUTION — ILLEGITIMATE CHILDREN — INTESTATE SUCCESSION — CONSTITUTIONAL LAW — STATE INTERESTS.

A statute in effect on October 14, 1972, allowed an illegitimate child to inherit when his father died intestate only if his parents married subsequent to his birth or if the parents acknowledged him as their child in writing and recorded the writing; this statute is not unconstitutional since the United States Supreme Court has found that there are legitimate state interests which can justify treating legitimate and illegitimate children differently (MCL 702.83; MSA 27.3178[153]).

7. DESCENT AND DISTRIBUTION — ILLEGITIMATE CHILDREN — INTESTATE SUCCESSION — PATERNITY ACTIONS.

The Michigan Supreme Court has determined that an illegitimate child can inherit from his father who dies intestate if, in a paternity action, it is determined that the intestate is his father.

8. DESCENT AND DISTRIBUTION — PATERNITY ACTIONS — TIMELINESS OF ACTION.

The courts of Michigan will not permit an illegitimate child, or the child's mother, to wait until long after the death of a putative father to assert a paternity claim and then, without corroborating proof, make a finding that the putative father is the father of the child.

9. Descent and Distribution — Legitimate Children — Illegitimate Children — Intestate Succession.

  It is not now and never has been the law in Michigan to treat legitimate and illegitimate children alike for purposes of intestate succession.

*John B. Nahan,* for plaintiff.

*James S. Ainsworth,* for defendants.

Before: Beasley, P.J., and D. F. Walsh and M. B. Breighner,* JJ.

Beasley, J. This case involves an appeal from an order determining the heirs of Jose Roman Blanco, Sr., also known as Joseph Blanco, deceased. Jose Roman Blanco, Sr., who will be referred to hereinafter for ease of reference as Blanco, died intestate on October 14, 1972. Eventually, on January 29, 1979, a probate judge found that the contested heirs, Maria Socorro Blanco, hereinafter referred to as Socorro, and Maria Santos de Esquilin, also referred to as Maria de los Santos Guzman Torres, hereinafter referred to as Esquilin, were heirs-at-law of Blanco, Sr. A motion for reconsideration by George Blanco, administrator of the estate and an uncontested heir, was denied and incorporated in an order of denial dated June 9, 1980. Jose R. Blanco, Jr., an uncontested heir, appeals, purportedly as of right.

On October 19, 1972, Sophia Blanco, the surviving widow of Blanco, filed a petition for appointment of an administrator in the estate. Sophia is now deceased. In that petition, which was prepared by the widow's attorney, L. J. Crum, and signed by the widow under oath, were listed seven

---

* Circuit judge, sitting on the Court of Appeals by assignment.

children of Blanco, three sons and four daughters, the last of whom was Maria Socorro Blanco and whose residence was indicated as San Juan, Puerto Rico. Esquilin was *not* listed as an heir-at-law in that first petition.

On October 19, 1972, George Blanco, an uncontested heir, was appointed special administrator with authority to carry on the furniture business previously conducted by his father, Blanco. At that time, Judge Cheever was presiding as probate judge. It was not until 1977 that Judge Greig succeeded Judge Cheever as probate judge for Allegan County and took over this case.

Eventually, on April 26, 1973, the probate court granted Sophia a widow's allowance of $150 per week. During this period, the statutory notices were being sent to Socorro, but not Esquilin, whose name had not yet appeared in the file. On July 23, 1973, atttorney Crum filed a notice of hearing for determination of heirs and, for the first time, notice was sent not only to Socorro, but to Esquilin.

On November 1, 1973, attorney James S. Ainsworth, appearing for Socorro and Esquilin, filed a memorandum of law in support of their position that they were heirs-at-law. In that memorandum, it was alleged that Esquilin had filed an action in Puerto Rico, seeking to be declared the daughter of Jose Blanco and Santos Torres. Counsel argued that the Michigan probate court should accept a determination by the Puerto Rican court with respect to the claim of Esquilin. Ainsworth filed an appearance for Socorro, but for her relied upon his brief on behalf of Esquilin. He concluded his memorandum of law by requesting that the Michigan probate court refrain from making a determination of heirs until completion of the Puerto Rican

proceeding. The record indicates that Judge Cheever acceded to that request.

In an answering brief, attorney Crum claimed the Puerto Rican birth certificates of Socorro and Esquilin did not support their claim. With respect to Socorro, he pointed out that her birth certificate shows her father's name to be Jose *Ramon* Blanco, rather than Jose *Roman* Blanco, and her mother to be Julia Figueroa. In Esquilin's birth certificate, it is recited that her father was Blas Guzman Cordova and her mother Santos Torres. He also pointed out that Jose Blanco never acknowledged either as a daughter.

As previously indicated, in her 1973 petition for appointment of administrator, the surviving widow (now deceased) listed Socorro as a daughter living in San Juan, Puerto Rico. Eventually, several years later, on a motion for reconsideration of the ruling determining heirs, attorney Crum, representing the widow and the estate at that time in 1973, testified that he had put down Socorro's name solely to give her notice of decedent's death and that he merely believed she was a possible party-in-interest. He testified that another daughter, Clarisa Harden, had told him that Socorro might be a daughter. He also testified that Clarisa Harden gave him similar information regarding Esquilin.[1]

On December 13, 1973, Judge Cheever signed an order authorizing the administrator, George Blanco, to retain counsel in Puerto Rico to represent the estate in connection with the Esquilin claim and to charge the fees and expenses of such representation against the estate.

---

[1] Specifically, Crum testified that Clarisa Harden said she thought her father was the father of two other girls in Puerto Rico, presumably Socorro and Esquilin. Unfortunately, the record does not indicate that anybody took testimony under oath of Clarisa Harden. Consequently, we are left to speculate as to the basis for her statements.

On October 28, 1976, more than four years after Blanco's death, the Puerto Rican court found that Esquilin (referred to in the ruling as Maria de los Santos Blanco Torres) was born on December 1, 1926, and that her parents were Jose Roman Blanco and Santos Torres. The transcript of the ruling which was translated into English was admitted into evidence on June 14, 1977, without objection.

The translation indicates that Santos Torres Aponte testified that when she was 16, Blanco, after drinking much rum, forced her to have sexual intercourse which made her pregnant with Esquilin. She said she never told Esquilin of the identity of her biological father because she considered Blanco a bad man. Also, she said that when Esquilin was about six months old, she began living with Blas Guzman Cordova, who requested a birth certificate for Esquilin as the legitimate daughter of him and Santos Torres, although he knew she was not his daughter.

Jaime Blanco and his attorney appeared in the Puerto Rican proceedings presumably in opposition to the claim that Esquilin is a daughter of Blanco. According to Santos Torres, Jaime Blanco, who is an uncontested heir, was five years old and present in the house when the sexual intercourse occurred in 1926. Jaime Blanco did not testify in the Puerto Rican proceeding. In fact, the only defense offered was the birth certificate of Esquilin showing Blas Guzman Cordova as her father. There was no cross-examination of Santos Torres.

Jaime Blanco did testify on June 14, 1977, in the probate court in Allegan, Michigan. He said he lives near San Juan, Puerto Rico, and that, while he had known Esquilin under another name for about 10 years, he never heard of her being or

claiming to be a daughter of his father until after his father's death. Regarding Socorro, he testified that he never met her or heard of her being or claiming to be his father's daughter until after his father's death. But, he did testify that his sister, Clarisa, "mentioned something" about Socorro and/or Esquilin in attorney Crum's office in Michigan after his father died.[2]

On January 12, 1974, an attorney by the name of Efrain Gonzalez Tejera, at the request of attorney Ainsworth, filed a so-called statement of Puerto Rican law. Apparently, Tejera is a 1969 graduate of Harvard and a professor of law at the University of Puerto Rico. He points out that under § 441 of the Laws of Puerto Rico, Title 31, all children have the same rights with respect to their parents' estate as would legitimate children. He says this provision was enacted on August 17, 1952, and that it implements a constitutional provision which provides that no discrimination shall be made on account of birth. He says paternity can be established by the usual evidence, for example, oral testimony or by any document such as a birth certificate. He says further that paternity is synonomous with filiation. He argues that any reference to "natural", "illegitimate", or "legitimized" is abandoned, as indicating discrimination in Puerto Rico. He says grandiloquently, "there is only one type of children". He contends that in Socorro's case, court action is unnecessary because her status as Blanco's daughter is established by the petition for administration filed by the widow naming her, Socorro, as a daughter. He says that under Puerto Rican law, the petition for administration is a public document and, therefore, paternity is established. Tejera's statement of the law is

2 *Id.*

interesting, but reads more like a brief on behalf of Socorro and Esquilin that an objective statement regarding Puerto Rican law.[3]

In May, 1974, George Blanco filed another accounting, which was apparently heard by Judge Cheever and approved, which accounting seemed to indicate a gross estate of approximately $193,000. In October, 1974, the administrator filed a petition to set aside funds approximating the shares that Socorro and Esquilin would receive if they were determined to be heirs-at-law of Blanco. On October 30, 1974, Judge Cheever signed an order authorizing the administrator to set aside these funds.

Eventually, after Judge Greig succeeded Judge Cheever and after the Puerto Rican proceedings came to an end, the probate court entered an order determining that Socorro and Esquilin were also heirs-at-law of Blanco. It is from that order that appellant appeals.

First, we find that the order determining heirs is a final order appealable as of right to this Court by the uncontested heirs-at-law.[4]

In determining heirs, the general rule is that the descent and distribution of property is determined by the law of the situs, actual or constructive. The situs of the property inventoried in the Michigan probate is Michigan. The now relevant Michigan law of intestate succession allows an

---

[3] The trial court declined to admit Tejera's statement as evidence. We see no error in that ruling. We treat Tejera's "statement" as a brief of counsel on behalf of the contested heirs-appellees.

[4] MCL 600.861; MSA 27A.861 provides in part:

"A party to a proceeding in the probate court may appeal the following orders as a matter of right to the court of appeals:

"(a) A final order affecting the rights or interests of any interested person in an estate or trust."

Also, see MCL 700.184; MSA 27.5184.

illegitimate child to inherit from his mother as if he were legitimate. However, the illegitimate child can inherit from his intestate father only if his father acknowledges him as his child in writing (except in unusual circumstances, this writing must be joined in by his mother), the father joins with the mother in a written request for a birth certificate correction, or the father and child have mutually acknowledged a parent and child relationship between each other beginning before the illegitimate child turned 18 and continuing until either's death.[5] This later statute was enacted, effective July 1, 1979, after the probate court made the determination of heirs. In addition, an illegitimate child can inherit from his intestate father if, in a paternity suit, it is determined that the intestate is his father.[6]

The relevant statute[7] in effect when the deceased died[8] on October 14, 1972, allowed the illegitimate

[5] MCL 700.104; MSA 27.5104, MCL 700.111; MSA 27.5111.

[6] *Easley v John Hancock Mutual Life Ins Co*, 403 Mich 521; 271 NW2d 513 (1978).

[7] MCL 702.83; MSA 27.3178(153), which provided:

"Upon the intermarriage of the parents of a child born out of wedlock, or, in the absence of such intermarriage, upon the parents of such child, by writing under their hands, acknowledging it as their child, in either instance such child shall be legitimate with the identical status, rights and duties of a child born in lawful wedlock, effective from its birth. It shall not be necessary for the mother of such child to join in such acknowledgment in case she is disqualified to act by reason of insanity, mental incapacity, death, or if for any other reason satisfactory to the probate judge of such county, it is not practical for her to join therein. The failure of the mother of such child to join in any acknowledgment otherwise filed in accordance with the provisions of this section shall not invalidate or otherwise affect the same in any manner. Such acknowledgment shall be executed and acknowledged in the same manner by law provided for the execution and acknowledgment of deeds of real estate, and be recorded at any time in the office of the judge of probate of the county in which such father or mother of such child resided at the time of the execution and acknowledgment. Nothing in this section or done pursuant hereto except intermarriage shall give any person or persons any rights, standing or preference in any controversy relating to proceedings pursuant to chapter 10."

[8] See *In re Adolphson Estate*, 403 Mich 590, 593; 271 NW2d 511

child to inherit intestate from his father only if his parents married subsequent to his birth or if the parents acknowledged him as their child in writing and recorded the writing. *Easley v John Hancock Mutual Life Ins Co,*[9] which provides an illegitimate child can inherit from an intestate father where a paternity suit named him as his father, was not decided until November 20, 1978.

However, while in general the situs of the estate property determines what descent and distribution laws control, many, if not a majority, of the cases hold that whether a particular child is legitimate so. as to bring him within the class entitled to inherit is a question of his personal status and, as such, is governed by the personal law of the child. In this connection, see 87 ALR2d 1274, § 3, p 1280, which states the rule as follows:

"The applicability of the ordinary rule that as a paramount principle the descent and distribution of property is to be determined by the law of the situs (actual or constructive) is denied by few if any cases involving illegitimates, and is recognized at least impliedly by virtually all the cases within the scope of the present annotation. However, where the law of the situs provides no statute of inheritance either absolutely excluding those born out of wedlock, regardless of legitimation, from the line of succession, or, conversely, absolutely bestowing inheritance rights upon such persons, the rule that the law of the situs determines inheritance rights does not in itself necessarily resolve the question of inheritance without reference to the question of what law determines the status of the child as legitimate or illegitimate. On the last point, the courts in an overwhelming majority of jurisdictions take the position that the question whether a particular child has acquired the requisite status of legitimacy to

(1978), where the Court said: "Determinations of heirs are to be governed by statutes in effect at the time of death."

[9] See fn. 6.

bring him within the class of persons who are permitted to inherit by the law of the situs is a question, not of descent or distribution, but of personal status, and as such is governed by the personal law of the child, and the existence or acquisition of a legitimate status by the child's personal law will be given effect under the inheritance law of the situs (so long as such recognition does not violate the public policy of the forum or situs), as will the denial of such status. See the following cases supporting this proposition either expressly or by fair implication: * * *." (Footnotes omitted; citations omitted.)

For example, in *Howells v Limbeck*,[10] the court stated:

" 'The Ohio courts seem to agree with those in most of the American jurisdictions, that the status of legitimacy conferred by the law of another state places the child in the same situation with regard to inheritance as though he were legitimate.' "

In other words, while Michigan law governs descent and distribution because the situs of the estate property is in Michigan, the majority rule holds that whether or not a person is within the class of people deemed to be allowed to inherit is to be determined by that individual's personal law.[11]

[10] 16 Ohio Op 2d 68, 70; 172 Ohio St 297, 301; 175 NE2d 517, 520; 87 ALR2d 1269, 1273 (1961).

[11] The following cases hold with the rule: *Allen v Califano*, 452 F Supp 205 (D Md, 1978) (applying Pennsylvania law), *In re Estate of Kirkby*, 57 Misc 2d 982; 293 NYS2d 1008 (1968), *In re Estate of Spano*, 49 NJ 263; 229 A2d 645 (1967), *Rhode Island Hospital Trust Co, Trustee v Hopkins*, 93 RI 173; 172 A2d 345 (1961), *Lopes v Downey*, 334 Mass 161; 134 NE2d 131 (1956), *Niles v Niles*, 35 Del Ch 106; 111 A2d 697 (1955), *Milton v Escue*, 201 Md 190; 93 A2d 258 (1952), *In re Thorn's Estate*, 353 Pa 603; 46 A2d 258 (1946), *Peirce v Peirce*, 379 Ill 185; 39 NE2d 990 (1942), *Succession of Caballero v Executor*, 24 La Ann 573 (1872). In fact, some cases have denied inheritance to someone even though the law of the situs would have allowed inheritance. *Succession of Goss*, 304 So 2d 704 (La App, 1974), *lv den* 309 So 2d 339 (1975).

However, a number of cases follow the minority rule which applies the law of the situs to determine who is within the class to inherit.[12] We are inclined to believe Michigan will be better served by following the minority rule, *i.e.,* letting the law of the situs of the property included in the probate estate control the question of whether a child is legitimate. Since passage of such property on death depends upon a Michigan probate court, we believe it would be more fitting to look to Michigan law to decide the status of whether a child is legitimate or illegitimate. All persons within the state will be treated equally whether they have just entered the state from a state with drastically different concepts of legitimacy or have resided in this state all of their lives.

If Michigan lawmakers consider it wise to follow the law of Puerto Rico and to obliterate all distinctions between legitimate and illegitimate children, there is no reason Michigan cannot do so. But, the point is the decision should be Michigan's and not that of some other state.

Applying the Michigan law in effect in 1972, and, thus, following the minority rule, we note that on this record there is no proof that Esquilin was a legitimate daughter of Blanco. Neither is there any indication that Blanco and Santos Torres ever married nor that Blanco ever acknowledged Esquilin as his daughter.

Regarding Socorro, a Puerto Rican birth certificate showing that she was born to Ramon (or Roman) Blanco and Julia Figueroa on May 24,

---

[12] The following cases follow the minority view: *In re Lund's Estate,* 26 Cal 2d 472; 159 P2d 643; 162 ALR 606 (1945) (a 4-3 vote), *Rossi v Zappaterra,* 234 Cal App 2d 529; 44 Cal Rptr 541 (1965), *In re Engelhardt's Estate,* 272 Wis 275; 75 NW2d 631 (1956), *In re Wehr's Estate,* 96 Mont 245; 29 P2d 836 (1934), *Sneed v Ewing,* 28 Ky 460; 22 Am Dec 41 (1831).

1923, in San Juan was admitted in evidence. The record does not show that Blanco and Julia Figueroa ever married nor that Blanco ever acknowledged Socorro as his daughter.

Before drawing conclusions from this analysis, two further factors must be considered. First, was the Michigan statute of descent and distribution in effect in 1972 at the time of Blanco's death unconstitutional? Second, what effect, if any, must be given to the adjudication of the Puerto Rican court that Blanco was the father of Esquilin?

In *Trimble v Gordon*,[13] the United States Supreme Court held unconstitutional an Illinois statute which allowed illegitimate children to inherit by intestate succession *only* from their mothers. Deta Trimble was the illegitimate daughter of Jessie Trimble and Sherman Gordon. Before his death in 1974, Sherman was determined to be the father of Deta in a paternity action and a support order was entered. It was claimed that he openly admitted and acknowledged her to be his child. The Illinois courts, both trial and appellate, excluded Deta from inheriting, thus upholding the constitutionality of the Illinois statute. On appeal, the United States Supreme Court reversed, holding that the statute afforded an invidious discrimination against illegitimate children so as to make the statute unconstituional, but did not reach the sex discrimination issue. The Supreme Court went off on an equal protection theory as a basis for decision. Appellees argued that the equal protection challenge was countered by the state's interest in encouraging family relationships and in establishing an accurate and efficient method of disposing of property on death.

In *Trimble* the Supreme Court held that the

---

[13] 430 US 762; 97 S Ct 1459; 52 L Ed 2d 31 (1977).

classifications based on illegitimacy did not so infringe upon personal rights as to require invocation of the so-called strictest scrutiny standard. The traditional common-law rule had been that an illegitimate child was *filius nullius* and incapable of inheriting from anyone. Believing that this rule was harsh, the state had enacted the subject statute somewhat ameliorating the harshness of the common-law rule. The Supreme Court said that, while recognizing the appropriateness of state concern with the family unit, the flaw in the reasoning as applied to that case was the lack of a shown connection between the so-called character of the discrimination and its relation to legitimate legislative aims.

The Supreme Court then seems to legislate in *Trimble* by pointing out that there is a middle ground and that Illinois need not have taken as extreme a position as they had. The Court speaks of deciding whether the statute is "carefully tuned to alternative considerations", but goes on to conclude that difficulties of proving paternity in some situations do not justify the total statutory disinheritance of illegitimate children whose fathers die intestate. The Illinois Supreme Court had indicated that the fathers could have left substantial parts of their estates to their illegitimate children merely by writing a will and that such a possibility is constitutionally significant.

For example, in *Labine v Vincent,*[14] it is pointed

---

[14] *Labine v Vincent,* 401 US 532, 538-539; 91 S Ct 1017, 1021; 28 L Ed 2d 288, 294 (1971). In this sound opinion, Justice Black says:

"But the power to make rules to establish, protect, and strengthen family life as well as to regulate the disposition of property left in Louisiana by a man dying there is committed by the Constitution of the United States and the people of Louisiana to the legislature of that State. Absent a specific constitutional guarantee, it is for that legislature, not the life-tenured judges of this Court, to select from among possible laws." (Footnote omitted.)

out that there are three ways that the illegitimate child could have shared in the father's estate: (1) by will, (2) by legitimating the child by marrying the mother, and (3) by giving the child a status of a legitimate child by an acknowledged paternity.

The United States Supreme Court in *Trimble, supra,* responds to these arguments by resort to fundamentals, saying that the question is the constitutionality of a state intestate succession law that treats illegitimate children differently from legitimate children and that traditional equal protection analysis asks whether this statutory differentiation on the basis of illegitimacy is justified by the promotion of recognized state objectives. If not, it cannot be saved from the constitutional challenge. The Supreme Court then concludes that the Illinois statute is unconstitutional.

In *Lalli v Lalli,*[15] the United States Supreme Court retreated from the high-water mark reached in *Trimble, supra,* and upheld the constitutionality of a New York statute which required illegitimate children who would inherit from their fathers by intestate succession to provide a particular form of proof for paternity.

The New York statute provided that an illegitimate child is the legitimate child of his father so that he and his issue may inherit *if* a court of competent jurisdiction has, during the lifetime of the father, made an order of filiation declaring paternity in a proceeding instituted during the pregnancy of the mother, or within two years from the birth of the child. In support of his position, the plaintiff in *Lalli* offered, among other things, an affidavit in which decedent referred to him (appellant) as his son for purposes of the son's getting married.

---

[15] 439 US 259; 99 S Ct 518; 58 L Ed 2d 503 (1978).

The New York Court of Appeals held that *Labine, supra,* required the state only to show that there is a rational basis for the means chosen by the legislature for the accomplishment of a permissible state objective. After *Trimble, supra,* the *Lalli* case was remanded and again heard by the New York Court of Appeals with the same result.

En route to distinguishing *Lalli, supra,* from *Trimble, supra,* the Supreme Court in *Lalli* said the narrow issue is whether the discrete procedural demands which the statute places on illegitimate children bear an evident and substantial relation to the particular state interest the statute is designed to serve, and this came after indicating that the New York statute in no way asserted as a basis of its enactment the encouragement of legitimate family relationships.

The Supreme Court in *Lalli* distinguishes between the difficulties of proof in establishing maternity, which is seldom difficult, and paternity, which frequently is difficult when the father is not part of a formal family unit. The Court says, further, that the putative father often goes his way unconscious of the birth of a child and, even where conscious of it, is often totally unconcerned because of the absence of any ties to the mother, and that it is not unusual that the mother may not know who is responsible for the pregnancy.

The Supreme Court in *Lalli* expressly recognizes the fact that there are difficult problems of proof and that spurious claims can be difficult to expose. The Supreme Court says that the accuracy of a finding is enhanced by placing paternity disputes in a judicial forum *during the lifetime* of the father; further, that it is important that the putative father have an opportunity to respond rather than to have the issue first brought to light when the

distribution of the assets of an estate is in the offing.

Thus, the Supreme Court in *Lalli* concludes that the statutory requirement imposed upon illegitimate children who would inherit from their fathers is substantially related to important state interests that the statute is intended to promote and that, therefore, there is not any violation of the Equal Protection Clause.

In the light of *Lalli, supra,* in which the United States Supreme Court gives recognition to the fact that there are legitimate state interests which can justify treating legitimate and illegitimate children differently, we decline to find the old statute[16] unconstitutional.

The second question then remains, namely, what effect, if any, must be given to the adjudication of the Puerto Rican court that Blanco was the father of Esquilin.

The Puerto Rican court, in a proceeding more than 4 years after Blanco's death and about 50 years after the alleged conception of the child by Blanco, held that Blanco and Santos Torres were the parents of Esquilin.

We believe that under no circumstances would a Michigan court permit an illegitimate child (or her mother) to wait until long after the death of a putative father to assert a paternity claim and then, without corroborating proof, make a finding such as that made by the Puerto Rican court. Such a proceeding would be contrary to the policy and to the law of Michigan, both as it existed in 1972 and as it is today.

As previously indicated, we find that the law of Michigan, *not* the law of Puerto Rico, controls the descent and disposition of property located in

---

[16] MCL 702.83; MSA 27.3178(153).

Michigan. Under Michigan law, even if we give effect to the finding of the Puerto Rican court that Esquilin was the daughter of Blanco and Santos Torres, she would nevertheless be an illegitimate daughter and, as an illegitimate daughter, *not* entitled to inherit from Blanco. While the policy of the Puerto Rican law is to treat legitimate and illegitimate children alike, that is not now and never has been the law in Michigan.[17]

In summary, we hold that, under Michigan law, Esquilin is not an heir-at-law of Blanco and, therefore, is not entitled to inherit from him. We further hold that under Michigan law, Socorro is not an heir-at-law of Blanco and, therefore, is not entitled to inherit from him.

Reversed.

---

[17] We are aware of *Torres v Gardner,* 270 F Supp 1 (D Puerto Rico, 1967), but it relies mainly upon an interpretation of the Social Security Act, which is inapplicable here.